SECURITY STATE BANK et al., Respondents (Appellants in one case) v. GANNON et al., Appellants (Respondents in one case.)  (3 Cases.)

SEAMAN, Respondent, v. SAME, Appellants.

(163 N. W. 1040.)

(File Nos. 4070, 4072, 4096, 4136.  Opinion filed August 7, 1917.)

1.  Banks and Banking—Stockholders' Liability, Extent of—Change of Stock Ownership, Double Assessment Untenable—Constitutional Provision, Total Stock Liability Under.

The holder of stock in a state bank, who is not owner of the entire bank stock is not, under Const., Art. 18, Sec. 3, providing that shareholders of banking corporations are individually liable for all contracts, debts, and engagements of the corporation to extent of amount of their stock therein, at

par value thereof, in addition to amount invested in such shares, liable for the full amount of the corporation's stock. Nor should a part of the stock stand liable to a single assessment while the remainder is held liable for a double assessment, such double assessment being imposed simply because such part of the stock changed ownership. The Constitution contemplates a total liability for each share equal to face value thereof; such liability, however, under certain circumstances, being shared by successive owners thereof.

2. **Banks and Banking—Solvent State Bank—Officers Refusing to Conduct—"Unsound Bank," Examiners' Right to Possession, Finding, Sufficiency of Evidence to Support.**

Where the evidence showed that a state bank, at the time it was turned over to the state examiner, was a going concern and as such was solvent, the evidence did not warrant finding of unsoundness as a basis for placing bank in the hands of examiner; and while the bank should not have been turned over to him when the managing officers refused longer to conduct it, yet the examiner was justified, under the evidence, in taking possession of the bank.

3. **Banks and Banking—State Bank, Receivership, Stockholders' Remedy by Injunction Against—Statute—Waiver of Stockholders' Remedy, Effect.**

While the assets of a state bank which, as a going concern, was solvent, should not have been placed in the hands of the bank examiner, yet he was justified under the circumstances shown to exist in taking possession of the bank; as the stockholders had a remedy against further proceedings by him, by injunction, under Laws 1911, Chap. 256, Sec. 17, providing for such injunction whenever such bank deems itself aggrieved thereby. Not having sought such remedy, such stockholders were not in position in the case at bar to raise any question as to rightfulness of examiner's possession, or as to his right to recover from individual stockholders upon their liability to assessments under Const., Art. 18, Sec. 3.

4. **Banks and Banking—Reorganization of State Bank—Stockholders' Knowledge of Administrator's Misappropriation of Stockholders' Shares—Constructive Notice—Finding, Sufficiency of Evidence.**

Where, in a suit by a state bank against stockholders upon their constitutional liability, it appeared that the administratrix of an estate, which estate owned the bulk of the bank's stock under its original organization, had raised money through invalid sale of such stock, and applied the same in taking up bad assets of the bank, held, that while it is doubtful under the evidence whether actual knowledge of these matters was brought home to stockholders of the bank as thereafter re-

organized, yet, it appearing that there was ample constructive notice sufficient to put them upon inquiry which, if followed up would have lead to full knowledge, a finding that new stockholders had actual knowledge thereof will not be disturbed.

5.  **Banks and Banking—State Bank—Reorganization, Stock Cancellation and Re-issue—Examiner in Possession—Right of Stockholder to Object to Reorganization—Old and New Stockholders—Estoppel.**

A state bank president, owner of nearly all its stock, died intestate. His wife owned 5% of the stock, and became administratrix of his estate; one of two minor children being owner of 5% of the stock. The bank having, shortly after his death, been placed in the hands of the bank examiner, and several depositors desiring to reorganize the bank, they entered into an agreement with deceased's widow the purpose of which was to improve the condition of the bank's assets; the widow surrendering thereunder for cancellation the stock held by decedent, and new stock certificates were issued. The moneys paid for the new shares went to the bank, and not to the widow. In the transaction of reorganization the widow assumed to sell the decedent's stock in course of probate, the sale being invalid for want of proper notice, and never having been confirmed. With funds secured by such pretended sale, from life insurance money in her hands as guardian of the minor children and from a bank deposit to credit of the estate, she purchased securities of the bank of doubtful value. The reorganizers had full knowledge of the sources from which such moneys came. The bank, after running for a time under the reorganization, was again placed in the hands of the bank examiner. The bank's indebtedness greatly exceeded $10,000, its total capital stock. In a suit to enforce liability of the stockholders, under Const., Art. 18, Sec. 3, with which were consolidated actions involving the rights of the minors, and of said estate, **held,** without regarding any equities existing between the old and new stockholders, and considering only the rights of the bank and its creditors, that all stockholders, old and new, were, under the facts and circumstances appearing and involved in the reorganization, estopped from questioning the validity of what was done in its reorganization, including the disposal of the stock of said estate and the purchase of said doubtful assets with part of the proceeds thereof; a new administrator subsequently appointed, although in court in one of said actions seeking certain relief, not having sought to set aside the attempted sale of said stock.

6. **Banks and Banking—State Bank—Reorganization, Depositors' and Stockholders' Liability—Judgment Restoring Situation Prior to Reorganization, Error in, Grounds of Error.**

Under facts and circumstances so shown to have existed, held, that the trial court erred in entering judgment under which it was attempted to restore the situation existing, prior to reorganization of the bank; that the rights of all parties should be adjusted upon the basis that the transactions had in connection with the reorganization of the bank were valid and binding upon all parties thereto; that upon such adjustment the present stockholders should be held primarily liable, and the former stockholders secondarily liable, each to the extent of his or her share of stock, for the $10,000 assessable under said constitutional provision.

Appeal from Circuit Court, Faulk County. Hon. THOMAS L. BOUCK, Judge.

Action by the Security State Bank and J. L. Wingfield, as Public Examiner of South Dakota, against F. B. Gannon, and Robert J. Seaman as administrator of the estate of Albert W. Morse, deceased, and others, to enforce liability of stockholders of plaintiff bank; by the Security State Bank and another, against F. B. Gannon and others, for certain incidental relief; by the Security State Bank and another, against F. B. Gannon, Robert J. Seaman and others, for certain incidental relief; and by Robert J. Seaman, as administrator, against F. B. Gannon and others, for recovery of money. All said actions, save the last, were consolidated for all purposes, and findings of fact and judgment were entered therein; separate findings and judgment being entered in the last-named suit. In the first, F. B. Gannon and certain unnamed defendants appeal; in the second, plaintiffs appealed; in the third, Robert J. Seaman and certain unnamed defendants appealed; and in the last suit, defendants appealed. Judgment in consolidated action reversed, with directions, and, in the last named action, affirmed.

*Crofoot & Ryan, Benjamin I. Salinger, Sterling & Clark,* and *D. H. Latham,* for Appellants in Security State Bank case, and for Appellant Gannon in Seaman case; *Crofoot & Ryan,* and *Benjamin I. Salinger,* for Respondents Gannon, Christian, Jumper, and Suttle, and Appellants on their appeal; and *Sterling & Clark, and D. H. Latham,* for Respondents Boller, Shirk, Frank J. and Charles S. Schenck, and Appellants on their appeal.

*Gardner & Churchill, Frank Turner, Null & Royhl,* for Appellants Morse and Seaman, as Appellants in Security Bank case, and as Respondents in Seaman case.

*F. E. Snider,* and *E. E. Wagner,* for Plaintiffs-Respondents in Security Bank case.

(1) To point one of the opinion, Appellants, in Security State Bank case, cited: Harper v. Carroll et al., 69 N. W. 610, 1069; Richmond v. Irons, 121 U. S. 27, S. S. C. Rep. 788, 802; Rev. Civ. Code, Secs. 856, 864.

Appellants Morse and Seaman, on their own appeal, cited: Farmers State Bank v. Empey, 35 S. D. 107; Harper v. Carroll (Minn.) 69 N. W. 610, 1068; 64 N. W. 145; Willus v. Mann (Minn.) 98 N. W. 341, 867.

Appellant-Respondents cited: Const. Art. 18, Sec. 3; Civ. Code, Sec. 846; Union National Bank v. Halley, 19 S. D. 474.

Respondent-Appellants Gannon et al., and on their own appeal, cited: Cook on Corporation (6th Ed.) Sec. 262; Harper v. Carroll (Minn.) 69 N. W. 610.

(5) To point five of the opinion, Appellants Morse and Seaman, on their own appeal, cited: Ware v. Houghton, 41 Miss. 370, 93 Am. Dec. 258; Kelsa v. Vance (Tenn.) 2 Baxt. 334; Civil Code, Sec. 1218; Ford v. Ford, 24 S. D. 644 (653); Ormsby v. Johnson, 24 S. D. 494.

WHITING, J. The action of Security State Bank et al. v. Gannon et al., which we will term the "main action," was brought to enforce the liability of stockholders of plaintiff bank under article 18, § 3, of the Constitution of this state. Various other actions, based upon transactions between certain of the defendants in the main action, and between such defendants and the bank, being pending in the same trial court, they were consolidated with the main action for purposes of trial. All of said actions, except one, were consolidated with the main action for all purposes, and findings of fact and judgment were entered therein. Separate findings and judgment were entered in the other action, being that of Seaman, Administrator, v. Gannon et al. From the first of such judgments, three separate appeals were taken; and from the other judgment one appeal. These appeals were submitted together to, and will be so disposed of by, this court.

No questions are raised in relation to the pleadings or to the forms of the several actions brought. The only questions go to the insufficiency of the evidence to support certain of the findings, and to the sufficiency of the findings to support the conclusions and judgments. The trial court found the following facts, which we think are the only ones material to any question necessary for consideration on these appeals:

Plaintiff bank, a corporation organized under the laws of this state, had been in existence for several years prior to October, 1913. In December, 1911, it was reincorporated, with a capital stock of $10,000, divided into shares of $100 each. At all times up to October 26, 1913, one A. W. Morse was the president and active manager of such bank, and the owner of 90 shares of its stock. For some time prior to October, 1913, and at all times since, the defendants Alice H. Morse and George H. Morse have each been the owner of 5 shares of such stock. On October 26, 1913, A. W. Morse died. On or about November 13, 1913, Wingfield, the state bank examiner and ex officio superintendent of banks, took possession of and closed the said bank. Alice H. Morse was appointed administratrix of the estate of A. W. Morse, and remained such administratrix until June 10, 1914, when the defendant Seaman, the present administrator of such estate, was appointed and qualified. A. W. Morse died intestate, leaving as his heirs said Alice H. Morse, his widow, and George H. Morse and Albert W. Morse, minor sons. In November, 1913, Alice H. Morse was elected president of said bank, and continued as such until Wingfield took possession thereof. Wingfield continued in possession until January 21, 1914.

On January 19, 1914, Alice H. Morse, in her individual capacity, entered into a contract with the defendant Gannon. Such contract—after reciting that Alice H. Morse, the first party thereto, was administratrix of the estate of A. W. Morse; that such estate was the owner of $9,000 of the capital stock of plaintiff bank, in which bank said first party was interested both as heir and as an individual owner of $500 of its capital stock; that the bank had been closed by the superintendent of banks; that for the benefit of said estate and the said first party it was desired to arrange for the reopening of said bank and its continuation in business; that the assets and liabilities of said bank

appeared to be as shown by a certain balance sheet that had been made by the officer in charge of said bank; that the second party, Gannon, had agreed to purchase or cause to be purchased from the estate $6,000 of capital stock of said bank at par for himself and each other parties as he might associate with himself as stockholders; and that said first party had agreed to improve the conditions of the assets of said bank in the manner thereinafter provided—contained the following provisions: First party agreed that she, as administratrix, would take all necessary legal steps to procure the sale and transfer of said stock to the purchasers in the manner required by law, and agreed to personally warrant to such purchasers the title to the stock so sold and transferred. Second party agreed, subject to the approval of the superintendent of banks, to procure the reorganization of the said bank by the election of new officers; to reopen said bank on January 20, 1914, or as soon thereafter as possible, and that the said bank, as reorganized, should take over and hold the present assets of said bank, improved as in said contract provided, and assume all its liabilities, except as in said contract provided. First party agreed that, in order to improve the assets of said bank, she would, among other things to be done by her, take from said bank bills receivable of doubtful value to the face value of $16,000, to be selected by second party and his associates, and to pay into said bank in consideration for such bills receivable, upon the day of such reorganization, the sum of $16,000 in cash. She agreed that, if the remaining assets of the bank were below a certain fixed amount, she would make good the deficiency. She also agreed to guarantee the remaining bills receivable of said bank. There were other provisions of said contract under which said first party became further obligated. The defendants Christian, Suttle, and Jumper were the parties associated with Gannon, for whose benefit he entered into such contract.

In pursuance of the above contract, on January 21, 1914, the defendants Gannon, Boller, Shirk, Christian, and the Schencks met Alice H. Morse and Wingfield at the bank's office, and Alice H. Morse surrendered for cancellation the certificate of the 90 shares of capital stock belonging to the estate of A. W. Morse. This certificate was canceled by indorsement of cancellation thereon, and thereupon there were issued new certificates of stock as

follows: To Alice H. Morse, 10 shares; Andrew Boller, 5 shares; J. P. Shirk, 5 shares; C. S. Schenck, 5 shares; F. J. Schenck, 5 shares; F. B. Gannon, 15 shares; O. H. Christian, 30 shares; J. H. Suttle, 10 shares; and S. H. Jumper, 5 shares. Boller paid for his shares by drawing his check for $500 against a checking account which he had in plaintiff bank. Shirk paid for his shares by check upon his account in said bank for $240 and by the payment of $260 in cash. The Schencks paid for their shares by transferring to said bank a certificate of deposit in the sum of $1,000 held by them against said bank. The shares of Gannon, Christian, Suttle, and Jumper were paid for by Gannon paying $6,000 in cash on behalf of himself and said other parties. All of the moneys so paid were paid into the bank, and not to Alice H. Morse.

Prior to January 21, 1914, Alice H. Morse had been appointed guardian of the minors, George H. and Albert W. Morse. As such guardian she had collected and received $4,000 life insurance upon policies written upon the life of A. W. Morse, in which policies said minors were named as beneficiaries. As administratrix she had borrowed $3,000 upon land belonging to the A. W. Morse estate. She had in her possession $1,000 insurance money paid to her as the beneficiary in a policy of insurance on the life of said A. W. Morse. On January 21, 1914, there was on deposit to the credit of A. W. Morse on open account in plaintiff bank the sum of $1,920. Pursuant to the contract above referred to there were taken from said bank, on January 21, 1914, bills receivable aggregating, not merely the $16,000 as agreed, but $19,739.34, which were delivered to Alice H. Morse and paid for by her with the insurance moneys above referred to, the moneys borrowed by the estate of which she was administratrix, a check upon the account of A. W. Morse, and an individual check of Alice H. Morse in the sum of $79.62. The other reorganizers of the bank had full knowledge of the sources from which Alice H. Morse obtained the funds so paid into the bank, and of the purposes for which it was paid into such bank. In addition to the foregoing payments by Alice H. Morse, and the moneys, checks, and certificates turned into said bank by the other new stockholders, Alice H. Morse gave to the bank her promissory note in the sum of $3,848.27. It was in consideration of the $1,000 paid

by Alice H. Morse, and of the checks, certificate, and moneys paid and turned over to the bank by the other reincorporators, that the certificates for the respective shares were issued to each of said reincorporators as above noted.

After the above transaction a shareholder's meeting was held, at which Christian, Boller, F. J. Schenck, Alice H. Morse, and Gannon were elected directors. Immediately thereafter, at a directors' meeting, the defendant Gannon was elected president, Boller and Alice H. Morse vice presidents, and Christian cashier, of plaintiff bank. The said total sum of $21,848.27, paid into said bank by and on behalf of Alice H. Morse at the time of the reorganization of plaintiff bank, covered the $19,739.34, the amount of bills receivable turned over to her, and some $2,108.93 claimed as the amount due from her on the other covenants of her contract with Gannon.

After the moneys were so paid in and the officers elected, Wingfield surrendered the bank to such officers, with license to them to reopen and operate said bank as a going concern. The bank was operated under the new management until March 21, 1914. On the evening of March 20, 1914, at a conference between Gannon, Christian, and Alice H. Morse, a question arose as to an error made on January 21, 1914, in charging against Alice H. Morse an item of $1,014.90 as a liability of the bank, which item was carried upon the books of the bank as a cashier's special account. These parties consulted with Wingfield in relation to such entry, and, not being able to agree in relation thereto, Gannon, as president of said bank, directed Wingfield to take possession of the bank and close same. Alice H. Morse, through her attorney, protested against the surrender of said bank to Wingfield, stating that Gannon had no authority to so turn the bank over; that the bank was solvent, and hence there was no occasion for turning it over to the superintendent of banks; and that, if Gannon persisted in doing so, he did it at his own peril and without the authority or consent of Alice H. Morse. Gannon persisted in his determination to turn over the bank to Wingfield, and ordered the cashier, Christian, to post a notice on the door of the said bank that "this, the Security Bank of Faulkton, is in the hands of the public examiner," and to sign the same as cashier. Christian, as such cashier, did post such notice on the

21st day of March, and notified Wingfield thereof, whereupon Wingfield, as superintendent of banks, took possession of said bank and has ever since retained possession of same. Such bank is in the process of liquidation.

Upon the closing of the bank on March 21, 1914, there remained of the indebtedness of said bank, which was in existence prior to January 21, 1914, a sum far in excess of $10,000, and, between January 21, 1914, and March 21, 1914, new indebtedness was created far in excess of $10,000.

When Alice H. Morse and Gannon entered into the contract above referred to, and at the time of the several transactions had thereunder in the reorganization of said bank, all of those who afterwards became stockholders in said bank under such reorganization had full knowledge that the title to the shares of stock was in the estate of A. W. Morse, and that no authority for the sale of said stock had been granted by the county court having jurisdiction of said estate. After such reorganization, Alice H. Morse, as administratrix of the estate of A. W. Morse, filed in the proper court a report that she had sold said stock as perishable property likely to depreciate in value, and not only to be entirely wiped out in value, but to become a liability against the estate to the extent of its face value, and she made application for an order confirming and ratifying such sale. No order confirming the sale was ever made. A hearing upon the application for confirmation was ordered, and due notice of such hearing given. No objection was filed to the confirmation of such sale, except an objection filed by Alice H. Morse as administratrix, after the time set for the hearing of such application for confirmation. In these written objections she set forth that the sale was void, because made without an order therefor; that the property was not perishable, nor likely to depreciate in value; and that said sale was made under a misapprehension as to the facts and the effect of such sale upon the estate. None of the purchasers of said stock ever attempted to have a hearing upon said applicaton for confirmation, or upon the objections filed by Alice H. Morse. No hearing was ever had thereon. No act seeking the rescission of said contract was done by either of said parties to whom said several shares of stock were issued.

16—Vol. 39, S. D.

At the time the plaintiff bank was first closed in November, 1913, Gannon had on deposit in said bank the sum of $7,500; Boller, the sum of $1,152.91; Shirk, $240; the defendants Schenck, the sum of $8,000. No part of the $6,000 paid by Gannon for himself, Christian, Suttle, and Jumper, and no part of the funds paid into said bank by Shirk, Boller, and the Schencks, was ever received by Alice H. Morse, as administratrix or otherwise. Alice H. Morse, neither personally nor acting as administratrix, solicited Shirk, Boller, or the Schencks to purchase stock in said bank or in any manner induced them to become purchasers of such stock, but said persons and each of them were interested in having the said bank reorganized and opened.

The trial court further found that Wingfield, upon examinations made by his office and upon reports made to him by the bank, concluded, and had reason to conclude, that the bank was in an unsound and unsafe condition to transact business, and that it was unsafe and inexpedient for it to continue business; that for that reason he took possession of the business and property of said bank on March 21, 1914, and has retained such possession for the purposes of administering the affairs of said bank, it appearing to him that the assets of said bank were insufficient to pay its liabilities; that he gave notice to the creditors of said bank, and made an inventory of its assets, in conformity with the laws of this state; and that he determined that the assets of such bank were insufficient, in the amount of $20,000 or more, to pay the liabilities of such bank.

The trial court concluded as a matter of law, in part, as follows: That the title to the shares of stock belonging to the estate of A. W. Morse did not pass from such estate; that Alice H. Morse should restore to the bank the bills receivable taken from such bank, and, if any part of same have been collected, that she should pay over to plaintiff Winfield, as bank examiner, for the use and benefit of said bank, the amount collected, less reasonable expenses for collecting same; that the $4,000 life insurance money should be restored from the funds of said bank to Alice H. Morse as the guardian of said minors, the same being trust funds; that the $3,000 proceeds of the loans on lands belonging to the estate of A. W. Morse should be restored from the funds of said bank to the administrator of said estate, the same being trust funds; that

the $1,000 life insurance money of Alice M. Morse, as well as the further sum of $79.62 paid into the bank by her, should be allowed as a general claim against the said bank, to be treated as a liability accruing subsequent to January 21, 1914; that the $1,920.38 which stood to the credit of A. W. Morse on open account should be reinstated as such credit, and allowed as a general claim in favor of the administrator of said estate, and treated as a liability accruing before January 21, 1914; that the $6,000 paid in by Gannon, Christian, Suttle, and Jumper should be allowed as a general claim in favor of said parties, and treated as accruing subsequent to January 21, 1914; that the note given by Alice H. Morse on January 21, 1914, should be canceled and surrendered to her; that the cash paid by Shirk to apply on stock issued to him be allowed as a general claim, and treated as accruing subsequent to January 21, 1914, and that his account on the books of said bank in the sum of $240, for which he gave his check in payment of said stock, be reinstated as it was on January 21, 1914; that the certificate of deposit, indorsed and surrendered by the Schencks in payment for their shares of stock, be restored to them, and their account therefor reinstated on the books of said bank as it was on January 21, 1914; that each of the new certificates issued for said 90 shares of stock on said reorganization be surrendered to the plaintiff Wingfield for cancellation; and that each and all of said parties be placed in statu quo as of the 21st day of January, 1914, so far as it is possible for them to be so placed; that the claim of plaintiff Wingfield on behalf of the bank against the estate of A. W. Morse for the sum of $10,000 on account of the liability of such estate under the provisions of article 18, § 3 of the Constitution of this state, be allowed and established as a valid and binding obligation against the said estate, and that the administrator be directed to pay the same in due course of the administration of said estate; that the minors, George H. and Albert W. Morse, be held not liable for an assessment on the stock standing in their names; that the check of Andrew Boller, given by him in payment of the shares of stock issued to him, be returned or canceled, and that his account for the amount thereof be reinstated on the books of the bank, and allowed and paid ratably with other creditors of the bank as of January 21, 1914; that, by reason of the facts

found herein, the persons to whom the new stock was issued be held to have knowingly and voluntarily assumed the status and obligations of stockholders of said bank, and, from their conduct, estopped, as against persons becoming creditors after January 21, 1914, from denying their liability, and that they and each of them should be held to pay to the plaintiff Wingfield, as public examiner, for the use and benefit of the creditors of the bank whose obligations accrued subsequent to January 21, 1914, the face value of the stock issued to them on the reorganization; that the claim of Alice H. Morse for the $1,000 paid in by her for the 10 shares of stock issued to her, the claim of Shirk for $260, of Gannon for $1,500, of Christian for $3,000, of Suttle for $1,000, and of Jumper for $500 paid in by them on the purchase of stock should be allowed as liabilities of said bank, and each of said persons should share pro rata with other creditors of said bank whose obligations were incurred subsequent to January 21, 1914; that the sum so recoverable for the benefit of the creditors of the bank should be distributed ratably with other assets of the bank among the creditors thereof—that is, the proceeds derived from the assets of the bank, other than stockholders' liability, should be distributed ratably among all the creditors of the bank, the $10,000 recovered from the estate of A. W. Morse should be distributed ratably among the creditors whose claims existed January 21, 1914, and remained unpaid March 21, 1914, and the $10,000 to be recovered from the new stockholders should be distributed ratably among the creditors whose claims accrued subsequent to January 21, 1914.

In the several actions other than the main action, and by cross-complaints in such main action, certain of the defendants in the main action sought relief as against certain other of such defendants. We do not deem it necessary to go into detail and state just what was sought by the several parties. None of the relief so sought was granted, except as noted in the conclusions of law above. None of the relief sought involved any question of the liability of Gannon to the other stockholders for damages growing out of his placing the bank in the hands of Wingfield on March 21, 1914, and it becomes unnecessary for us to intimate any opinion upon such question. We are of the opinion that none of the several defendants in the main action was entitled to

any relief as against his codefendants under the issues presented by the several pleadings, herein, except such relief as will be hereinafter noted.

[1] The all-important questions presented upon these appeals relate to the liability of the several defendants under section 3 of article 18 of our Constitution, and to which of such defendants, as between themselves, are primarily, and which secondarily, liable. Such section reads as follows:

"The shareholders or stockholders of any banking corporation shall be held individually responsible and liable for all contracts, debts and engagements of such corporation to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares or stock; and such individual liabilities shall continue for one year after any transfer or sale of stock by any stockholder or stockholders."

It will be seen that the trial court held that there was a double liability. He entered judgment against the estate of A. W. Morse for $10,000 and against the reincorporators for $9,000. It is perfectly clear that under no theory could the estate of A. W. Morse be holden to the extent of the full $10,000, as it never owned all the stock. It also seems too clear for argument that a part of the stock should not stand liable to only a single assessment and the remainder be liable for a double assessment— this double assessment being imposed simply because such part of the stock changed ownership. The Constitution contemplates —as all of the parties to this appeal now concede—a total liability for each share equal to the face value of such share. Such liability, however, may, under certain circumstances, be shared by successive owners of stock.

[2, 3] Complaint is made as to the sufficiency of the evidence to support certain of the findings. We think that in the main such findings are correct. We are, however, of the opinion that the evidence was insufficient to warrant the court in finding that Wingfield "had reason to conclude that the bank was unsound" on March 21, 1914. As a going concern it was undoubtedly solvent. Thrown into the hands of the public examiner, the value of its assets was certainly seriously impaired, so that it undoubtedly had insufficient assets with which to pay the heavy expenses attendant upon liquidation and have remaining sufficient

to meet its liabilities.   We do not, however, deem this fact material in this action, howsoever important it might be in some other action.   While the bank should undoubtedly not have been turned over to Wingfield, when the managing officers of such bank refused longer to conduct same, Wingfield was undoubtedly justified in taking possession of such bank.   The statute (section 17, c. 256, Laws 1911) prescribes a remedy for the stockholders, if they thought the bank should not remain in his hands.   Not having sought such remedy, stockholders of the bank are not in a position in this action to raise any question as to the rightfulness of Wingfield's possession, or as to his right to recover, under the above section of the Constitution.

[4] Question is raised as to the correctness of the finding that the new stockholders had actual knowledge of the sources from which Alice H. Morse raised the money used in taking up the bad assets of the bank, and had actual knowledge that she, as administratrix, had not procured an order for sale before undertaking to sell the shares of stock belonging to the estate of A. W. Morse.   While it is doubtful whether actual knowledge of all these matters was brought home to each and every one of such stockholders, it is clear that wherever actual knowledge was lacking there was ample constructive notice sufficient to put such party or parties upon an inquiry which, if followed up, would have led to full knowledge.

[5] A reading of the conclusions of the trial court reveals the fact that, basing his action upon the theory that the title to the stock never passed to the reincorporators, he sought to so adjust the rights of all parties that—to quote the words of such court—"all of said parties be placed in statu quo as of the 21st day of January, 1914, so far as it is possible for them to be so placed."   In other words, the trial court tried to "unscramble" the mess created by the acts of the parties.   In this we believe the trial court undertook what the facts did not equitably justify, even if it had been possible.   Moreover, the action of the trial court was a fruitless effort to "put Humpty-Dumpty together again."   We think that the trial court erred in not holding that each and every one of the defendants in the main action were estopped from denying that the reincorporators became vested with the legal title to the stock, and this regardless of the fact

that those steps were not taken which were essential to pass such title under the provisions of statute.  We are of the opinion that this is peculiarly a case wherein the trial court should, as a court of equity striving to do exact equity between all parties, both those before it and those reperesented by the superintendent of banks, have taken a board view of the whole situation presented to it, and have conformed its action to meet the situation thus presented.  We shall not attempt to review all the facts presented to the lower court, but will note a few matters which, to our minds, are of controlling importance.

The administrator of the estate of A. W. Morse is not in court seeking to have the attempted sale of this stock set aside. While both he, the minors through their guardian, and such guardian in her individual capacity, all sought the recovery of the moneys which were by Alice H. Morse paid into plaintiff bank to take up the questionable assets of such bank, contending that such moneys were obtained from said Alice H. Morse through fraud practiced on her, they also sought to hold the new stockholders for the conversion of the stock, and to have it decreed that such stockholders were estopped to deny its ownership.  There is thus presented a far different situation than would be presented if such estate were seeking a decree adjudging that it had at all times remained the owner of such stock.  The new stockholders became vested with the apparent title to the stock and assumed all the rights of stockholders, and, with such rights, all the obligations of purchasers from former stockholders, one of which was the relieving of the old stockholders from the constitutional liability for assessments; and, while they had notice, either actual or constructive, that the sale had not been confirmed by the county court, they continued to exercise the rights incident to full ownership of such stock and never, in any manner, attempted to repudiate such claim of ownership until the value of such stock had been materially diminished through no fault of the administratrix of such estate, and then they never attempted or offered to restore the status quo.  It is perfectly clear that such new stockholders considered themselves the owners of such stock, that they acted in accordance therewith, and that even Gannon, at the meeting on the evening of March 20, 1914, did not tender to Alice H. Morse the certifificates held by him because he thought he

did not own the same, but simply because he did not wish to have the bank pay to her what she claimed was due, owing to an error made in determining the amount due from her under the contract under which the bank was reorganized. It was only upon the theory that there had been a sale that a tender of such certificate would be necessary to a rescission. The new stockholders took and remained in possession and control of the bank and its business. Nothing could be more inequitable than to place upon the estate of A. W. Morse the primary liability to the creditors of the bank. If, owing to things occurring since January 21, 1914, the assets of said bank do not meet its liabilities, neither the cause nor the effect should be charged up to those who had surrendered control of such bank. Even as between the new stockholders and the estate, such new stockholders are in no position to question their own title, or to deny such liability as arises as an incident to ownership of the stock. Ware v. Houghton, 41 Miss. 370, 93 Am. Dec. 258; 10 R. C. L. 694.

Let us consider the situation in which the bank and its creditors are left by the judgment of the trial court. The evidence conclusively and undisputedly shows that A. W. Morse misappropriated a material part of the assets of the bank. For such misappropriation his estate would be liable. The strengthening of the assets of the bank, by the taking up of worthless and questionable bills receivable and the guaranteeing of the remaining bills receivable by Alice H. Morse, placed the bank assets on a sound basis—in a condition that met the approval of Wingfield. Hence there was no occasion for plaintiffs to file a claim against the estate of A. W. Morse. We may fairly assume that, as a result of the acts of Alice H. Morse, such bank was in far better shape than it would have been if plaintiffs had been required to look to the estate of A. W. Morse for a recovery based upon the wrongful acts of A. W. Morse. The time for filing such a claim had long since expired when the judgment in the main action was rendered. By such judgment the assets of the bank would be depleted in the sum of $10,848.27—the amount of the two funds found to be trust funds and of the note of Alice H. Morse, which note the judgment orders canceled. Moreover, by such judgment the liabilities of the bank, for debts accruing subsequent to January 21, 1914, would be increased in

the sum of $7,839.62, the amount of cash paid in by those who acquired new stock on the reorganization; and, for debts accruing prior to January 21, 1914, such liabilities would be increased in the sum of $3,660.38, being the amount of the accounts of A. W. Morse, Shirk, the Schencks, and Boller, restored by the court's judgment. To offset such depletion of assets and increase of indebtedness, amounting in all to over $21,000, the judgment restores to the bank the bills receivable delivered to Alice H. Morse upon the reorganization of the bank. The evidence conclusively shows that such bills receivable are of very limited value. It is true that such judgment holds the stockholders to a total liability of $19,000; but, as hereinbefore noted, it is clear and is conceded by all parties that such liablity is limited to $10,000. This liability of $10,000 is recoverable no matter who are held to be the owners of the stock. It is therefore clear that, by such judgment, the creditors of the bank—not only those who were creditors prior to the reorganization, but even those who became creditors thereafter—are left to suffer a loss of several thousand dollars in order to allow these new stockholders to repudiate the transaction into which they deliberately entered. Therefore, disregarding all the equities that may exist as between the old and new stockholders, and considering only the rights and equities of the bank and its creditors, all of the stockholders, both the old and the new, should be held estopped from questioning the validity of what was done in the reorganization of the bank. As is well said in 10 R. C. L. 689, the rule of equitable estoppel, which is so variously stated by authors and jurists, may be summed up as follows:

"A person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has in good faith relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity."

We therefore hold that the trial court erred in attempting to restore the situation existing prior to the reorganization of the bank; and we hold that the rights of all parties to the matters now before us should be adjusted upon the basis that the transactions had in connection with the reorganization of plaintiff bank

were valid and binding upon all parties thereto.  Upon such an adjustment the present stockholders should be held primarily liable and the former stockholders secondarily liable (each to the amount of his or her shares of stock) for the $10,000 assessable under section 3, art. 18, of the Constitution.  Farmers' State Bank v. Empey, 35 S. D. 107, 150 N. W. 936; Willius v. Mann, 91 Minn. 494, 98 N. W. 341, 867.

The judgment in the main case is reversed, with directions to the trial court to enter judgment in conformity with our holdings herein, but without costs to any party.  The judgment in the other case is affirmed, with costs for respondent.