KORBLY, RECEIVER OF THE PYNCHON NA-
TIONAL BANK, *v.* SPRINGFIELD INSTITUTION
FOR SAVINGS ET AL.

SPRINGFIELD INSTITUTION FOR SAVINGS ET
AL. *v.* KORBLY, RECEIVER OF THE PYNCHON
NATIONAL BANK.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE
FIRST CIRCUIT.

Nos. 26, 27. Argued November 8, 1917.—Decided December 10, 1917.

Under the National Banking Act the Comptroller has discretionary
power to withdraw an assessment on shareholders before it is paid,
or when partly paid.

Upon the evidence, *held*, that certain sums paid by savings banks to
the receiver of a national bank in which they held shares were in-
tended to be applied against their liabilities under the National
Banking Act, to enforce which an assessment, made by the Comp-
troller, was then outstanding. A second assessment, exceeding the
differences between their statutory liabilities and the amounts so
paid, was void.

In determining the effect of certain payments made by the trustees
of savings banks, the court here assumes, in the absence of contrary
evidence, that it was the purpose of the trustees to act within their
powers, and heeds the settled rule that when neither debtor nor
creditor has applied payments before the controversy has arisen the
courts will apply them in a manner to accomplish the ends of justice.

218 Fed. Rep. 814, affirmed.

THE cases are stated in the opinion.

*Mr. Charles G. Gardner*, with whom *Mr. Edwin S. Gard-
ner* and *Mr. Ralph W. Stoddard* were on the brief, for
Korbly, Receiver.

*Mr. Boyd B. Jones*, with whom *Mr. William H. Brooks*
was on the brief, for Springfield Institution for Savings *et al.*

MR. JUSTICE CLARKE delivered the opinion of the court.

These two cases are appeals from the Circuit Court of Appeals for the First Circuit, which were heard and will be decided together.

The Pynchon National Bank, of Springfield, Massachusetts, with a capital stock of $200,000, divided into 2000 shares of $100 each, became insolvent and in June, 1901, the Comptroller of the Currency appointed a receiver to liquidate its affairs.

Upon examination there were found among its assets bonds of the American Writing Paper Company, of the par value of $577,000, which the bank had purchased at a discount, but which, at the time of the transaction we are about to consider, had so depreciated that they were worth on the market only 65 cents on the dollar.

A consideration of the condition of the bank resulted on March 18, 1902, in an assessment by the Comptroller on the shareholders of their full statutory liability of 100%, payable on the 15th day of the following May.

Thereupon a plan was devised under which it was proposed that all of the shareholders, except the three defendant Savings Banks, should purchase from the Receiver the Paper Company bonds at 95 cents on the dollar, each shareholder to purchase one bond of $1,000 for every three shares of stock owned by him. This purchase price was an advance over the market price of 30 cents on the dollar and the excess payment by each shareholder would equal 82% of the assessment which had been made by the Comptroller. Because they lacked corporate power to invest in such bonds the Savings Banks with the approval of the Comptroller and shareholders were to pay to the Receiver the required advance over the market price without purchasing their quota of the bonds.

The Comptroller cordially approved of this proposed purchase and in a letter to the Board of Directors of the

insolvent Bank, the contents of which were intended to be and were communicated to its shareholders while the plan was under consideration, he stated that it would result in a settlement of the affairs of the Bank highly satisfactory for all interests concerned and that he was satisfied that if such sale of the bonds were made the Receiver would be able to promptly pay all of the creditors in full; but that if the plan failed and it became necessary to sell the bonds on the market there would be no escape from an assessment of 100% against the shareholders.

This proposed settlement was approved by all of the shareholders, and the defendant banks made payment to the Receiver as follows: The Springfield Institution for Savings $30,360.17; the Springfield Five Cents Savings Bank, $9,820.00, and the Hampden Savings Bank, $5,319.16. For these payments the banks did not receive any consideration other than the joining of the other shareholders in the plan, together with the anticipated saving of eighteen (18) per cent. of the assessment which the Comptroller had made against them. The bonds allotted the banks were sold at the market price.

After the completion of this bond transaction, the Receiver, under instructions from the Comptroller, on July 22, 1902, wrote to the shareholders as follows:

"Large amounts of securities sold make it probable that the payment of the assessment will not be required. The Comptroller has accordingly decided to withdraw this assessment and I have been instructed to suspend any action to enforce its payment. This withdrawal is made, however, without prejudice to the right of the Comptroller to levy and collect any assessment or assessments that may hereafter be necessary."

The results anticipated from this action on the part of the shareholders were not realized and in order to satisfy the still unpaid debts of the bank and interest and costs of administration, the Comptroller on December 28, 1906,

made a second assessment of $49 on each share of stock. The banks refusing to pay this second assessment this suit was instituted against them in the District Court and resulted in a holding in favor of the defendants, which was affirmed by the Circuit Court of Appeals in the decision which is now under review.

It will be necessary to consider but two questions, viz:

(1) Was the second assessment invalid because the Comptroller did not withdraw and had no legal authority to withdraw the first assessment?   and

(2) Was it the understanding that the payments made by the Savings Banks should be applied on the assessment for their statutory liability, so that they remained liable for only 18% additional?

From the earliest days of the administration of the National Banking Act to this case attempts have been made in many forms to give to it a technical construction which would so restrict the powers of the Comptroller as to greatly delay and impede the settlement of the affairs of insolvent banks.  But this court has uniformly declined to narrow the act by construction and has placed a liberal interpretation upon its provisions to promote its plain purpose of expeditiously and justly winding up the affairs and paying the debts of such unfortunate institutions. *Studebaker* v. *Perry*, 184 U. S. 258; *Kennedy* v. *Gibson*, 8 Wall. 498; *United States* v. *Knox*, 102 U. S. 422; *Bushnell* v. *Leland*, 164 U. S. 684; and *Bowden* v. *Johnson*, 107 U. S. 251.  There is nothing in the act to prevent the Comptroller from withdrawing an assessment before it is paid, or when it is partly paid, if it should be concluded that further payment is not necessary, and no form is prescribed in which such action shall be taken by him.  A large executive discretion is given to the Comptroller in this respect to adjust the assessments made, to the exigencies of each case, so that the shareholders may not be burdened by paying more than is necessary or at a time when the

money for any reason cannot be advantageously used. The wisdom of giving such large discretion to the Comptroller finds excellent illustration in the case before us. All persons interested in this bond transaction were convinced, in July, 1902, that further payment than that which had been made would not be needed, and a construction should not be given to the act, its specific terms not requiring it, which would prevent such action as was taken by the Comptroller in withdrawing for the time being the unpaid portion of the first assessment. We conclude that the claim that the Comptroller did not have power to recall the first assessment in whole or in part is unsound in principle and wholly unsupported by the terms of the act or by court decisions.

The remaining question is: Was it the understanding that the payments to the Receiver should be applied upon the statutory liability of the Savings Banks for which assessment, then in full force, had been made by the Comptroller?

The case was tried in large part upon a stipulation as to the facts, which contains the following:

"Inasmuch as it was *ultra vires* of Savings Banks under the statutes of the Commonwealth, as the Receiver and Comptroller at the time well knew, to purchase such bonds as an investment, it was arranged with the knowledge and approval of the Comptroller and the Receiver that the Savings Banks in question, instead of purchasing their proportion of the bonds, should pay the difference between their then market value and what the National Bank paid for them."

And also this:

The checks of the banks were received "Without any agreement on the part of the Comptroller or Receiver that the payments thereby made should in whole or in part discharge the liability of the Savings Banks for or on account of the indebtedness of the National Bank and

any stock assessments, excepting so far, if at all, as such agreement or obligation may be lawfully implied from the facts stated in this stipulation and such evidence as may be introduced."

It is argued for the Receiver that if it had been understood or intended that the payments by the banks should be credited on the outstanding assessment this would very certainly have found written expression, if not elsewhere, in the receipts given and received for the payments.

It is notable that, although this bond purchase involved more than half a million dollars, the terms and purposes of it were not expressed in any writing, either between the shareholders themselves or between the Receiver and the shareholders, which indicates that the transaction, while large, seemed simple to the men of affairs engaged in it and that to their minds, at least, the implication from the payments to be made could not be doubtful. The shareholders who purchased the bonds had the prospect— how valuable it was the record does not indicate, but still a prospect—of recouping their losses through a later increase in the market value of the bonds, but the Savings Banks had no such prospect, because, not having legal authority to make such purchase their payment of what equalled 82% of the assessment against them was a naked payment, without chance of reimbursement, in whole or in part, from any source.

The evidence introduced in addition to the stipulation of facts is slight, consisting of contemporaneous entries in the corporation record and account books of the banks, and the endorsement on the checks by which payment was made. This evidence is not conclusive, but the implications from it, such as they are, are favorable to the contention of the banks.

Since no clearly definite expression is found in the record either that these payments were or were not to be applied on the shareholding liability of the Savings Banks, we are

required to decide which contention of the parties is the more reasonable and probable, having regard to all the facts and circumstances, stipulated and proved in the case.

There being no evidence to the contrary, we must adopt the assumption of ordinary life and of law that the trustees for the Savings Banks acted lawfully, within the limits of their powers, and we must also have regard to the long settled rule of law that where neither the debtor nor the creditor has applied payments before controversy has arisen the courts will make application of them in a manner to accomplish the ends of justice. *United States* v. *Kirkpatrick,* 9 Wheat. 720; *National Bank* v. *Mechanics Bank,* 94 U. S. 437, 439. When to this we add that natural justice, as distinguished from a technical conclusion, requires that the Savings Banks be allowed credit for the payments that they have made, since thereby the creditors of the insolvent bank may get the benefit of the full statutory liability of the shareholders without a new and unanticipated obligation being imposed on the stockholding banks, we are compelled to resolve any doubt in which the record might otherwise leave us in favor of the defendants. It is impossible for us to conclude that the officials of these savings banks, trustees as they were for their depositors and stockholders, and having in mind the limitations on their powers, as the stipulation declares that they and the Receiver did have, should have made these considerable payments in such a manner as not to at all diminish the statutory liability of their banks, especially since payments not made to be applied on the assessment would be substantially unauthorized gifts, for, as we have said, the banks had no prospect, as the other stockholders had, of being reimbursed for such payments by the possible rise in the market value of the bonds,

It results that the decree of the Circuit Court of Appeals must be affirmed, but not on the ground stated in the opin-

ion of that court, and that the second assessment must be held void because excessive. This, however, without prejudice to the making of another assessment by the Comptroller upon the shareholding banks for the difference, if needed, between the amount paid and the amount of an assessment for the full statutory liability.

*Affirmed.*

MR. JUSTICE VAN DEVANTER and MR. JUSTICE PITNEY dissent.