### PAGE v. JONES.

(Circuit Court of Appeals, Eighth Circuit. September 4, 1925.)

No. 6866.

**1. Banks and banking ⚖═⇒248(1)—Nature of double liability of shareholder in national bank stated.**

The double liability of a shareholder of a national bank, under Comp. St. § 9689, is entirely statutory, and it attaches and exists for purpose of creating a fund for paying creditors of bank, equally and ratably, in manner and for purpose specified in statute.

**2. Banks and banking ⚖═⇒248(2)—Adjudication by Comptroller of insolvency, and adjudication and order of assessment or requisition on stockholders, conditions precedent to enforcement of stockholders' double liability.**

Indispensable conditions precedent to the enforcement of stockholders' double liability, under Comp. St. § 9689, are, first, adjudication of Comptroller of the insolvency of the bank, and that it is in liquidation, and, secondly, adjudication and order of assessment for requisition on the stockholders of the bank.

**3. Banks and banking ⚖═⇒248(1)—Payment of 110 per cent. of value of stock did not amount to payment of statutory double liability, where no adjudication of insolvency and no adjudication and order of assessment.**

Payment by stockholder of national bank of 110 per cent. of value of stock to receiver of bank did not amount to payment of statutory double liability, under Comp. St. § 9689, where at time payment was made there had been no adjudication of insolvency, nor of a state of liquidation of bank, and no assessment or requisition on shareholders of the bank was adjudged or made by Comptroller of double liability until after such sum was paid.

**4. Evidence ⚖═⇒65—Stockholder and receiver of national bank presumed to know legal conditions precedent to enforcement of the statutory double liability.**

Stockholder and receiver of national bank presumed to know that adjudication of insolvency and adjudging of assessment were conditions precedent to enforcement of the statutory double liability.

**5. Banks and banking ⚖═⇒248(2)—Receiver never acquired jurisdiction to levy statutory double liability, where no adjudication of insolvency, and no adjudication and order of assessment on shareholders.**

Receiver never acquired jurisdiction to levy statutory double liability, where there was no adjudication of insolvency, and no adjudication and order of assessment on shareholders under Comp. St. § 9689.

**6. Banks and banking ⚖═⇒248(1)—Stockholder not relieved of statutory liability because officers of bank fraudulently procured him to make payment of 110 per cent from stock value.**

A stockholder of a national bank, who was induced to make payment of 110 per cent. value of stock was not relieved from statutory double liability, thereby because of false representations of officers and directors, inasmuch as creditors were not responsible for acts and representations of officers.

**7. Banks and banking ⚖═⇒248(1)—Creditors not estopped from collecting statutory double liability, because they left deposits in bank after it resumed operations.**

Creditors of bank were not estopped from collecting statutory double liability from shareholders, duly assessed by Comptroller, by reason of fact that many of them left their deposits in bank for six months after it resumed operations after a prior receivership.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit by Irving Page, receiver for the First National Bank of Lawton, Okl., against M. F. Jones. Judgment for defendant, and plaintiff brings error. Reversed and remanded for new trial.

B. D. Shear and E. E. Blake, both of Oklahoma City, Okl. (Chester L. Evans, of Okla-

homa City, Okl., on the brief), for plaintiff in error.

J. B. Dudley and S. I. McElhoes, both of Oklahoma City, Okl. (Bailey & Hammerly, of Chickasha, Okl., on the brief), for defendant in error.

Before SANBORN and KENYON, Circuit Judges, and SCOTT, District Judge.

WALTER H. SANBORN, Circuit Judge. This is a suit by Irving Page, receiver of the First National Bank of Lawton, Okl., appointed by the Comptroller of the Currency on November 18, 1922, to collect an assessment and requisition of $1,000 made by the Comptroller of the Currency on January 27, 1923, on the defendant, M. F. Jones, the holder of 10 shares of the stock of that bank, of the par value of $100 each, to enforce his double liability to the creditors of that bank under section 5151, Revised Statutes, as amended (section 9689, U. S. Compiled Statutes).

The defendant pleaded two defenses: First, that on December 8, 1921, the bank had been closed, a prior receiver had been appointed, and soon thereafter an assessment of $1,000 had been made on his stock by the Comptroller to enforce his liability under section 9689, and he had paid it; and, second, that he had been deceived and defrauded into paying 110 per cent. of the par value of his stock to the prior receiver and the officers and directors of the bank by their false representations that by such payment, and by the payments by other stockholders, the bank would be made solvent, and he would be discharged of his liability under section 9689, and that the depositors, by agreements to leave their deposits in the bank for six months after its resumption of business, estopped themselves from subsequently enforcing any liability of the stockholders under that section. The plaintiff denied that any assessment on the stock was ever made prior to that of January 27, 1923, denied the alleged deceit, fraud, and false representations, and the alleged estoppel of the depositors. The case was tried to a jury, the court instructed them to find a verdict for the defendant, and this ruling is challenged as error.

At the trial these facts were conclusively established:

The bank became insolvent, ceased business, Bernard Ulrich was appointed receiver of it by the Comptroller of the Currency, and took possession of its property as such in December, 1921, and held it until May 22,

1922, when the Comptroller discharged him. He turned the property of the bank over to its officers; it resumed business, and continued to operate until, on November 18, 1922, the plaintiff was appointed receiver of it, and took and still holds possession of its property. The Comptroller never made any assessment on the defendant or his stock, or on the stock of any of the stockholders of the bank, prior to that of January 27, 1923. The defendant never paid any such assessment, and his first defense was proved to be baseless.

After Mr. Ulrich was appointed receiver, in December, 1921, some of the officers and directors of the bank, in order to secure a resumption of its business, conceived the plan of persuading its stockholders, who were able and willing to do so, to pay into the bank 110 per cent. of the par value of their stock, and of persuading other stockholders to surrender their stock and transfer it to other parties, who would pay in such 110 per cent. thereof. Another part of this plan was to obtain from as many of the depositors of the bank as possible written consents that their deposits should remain in the bank at least six months after it resumed business. They succeeded in executing this scheme. Pursuant to it $220,000 was paid into the bank by the stockholders, and depositors of about 85 per cent. of the deposits in the bank made written agreements to leave their deposits in the bank for six months after it resumed operations. Mr. Ulrich, the receiver, approved this plan and its execution, recommended them to the Comptroller, and he discharged the receiver. Mr. Ulrich immediately turned the property of the bank back to it, and it resumed business about May 22, 1922, and continued its operation until November 18, 1922, when it was insolvent, and the plaintiff was appointed its receiver and took possession of the property.

Mr. Jones, the defendant, testified that he was engaged in the cotton business during this time; that Mr. Maddux, the cashier of the bank, before the bank resumed its business, came to him and told him that he had come to collect his assessment, that he was stuck for 100 per cent., that Mr. Ulrich was ready for the money, and that, if he did not pay, Mr. Ulrich would bring suit and make him pay; that his answer to Mr. Maddux was that he was not ready to pay; that thereupon Mr. Maddux told him that his main business was not only to collect the assessment, but to talk with him about

the reorganization of the bank, and he then stated to him that by paying 10 per cent. more a surplus would be created, that the Robinsons proposed to put in $150,000 worth of good collateral and take out some bad paper, that they had $100,000 of surplus to charge off, $200,000 capital, and some undivided profits, and that the Robinsons putting in this amount would give them a chance to charge off approximately $500,000 worth of paper, which would put the bank in very good shape; that soon after this conversation he paid in the assessment; that he understood he paid it as a double liability, to satisfy that liability; that he believed these representations that the bank was in good shape and would be in good condition when it opened; that he knew that some of the depositors had made written agreements to leave their deposits in the bank for six months after its resumption of business; and that he would not have paid his 110 per cent. into the bank if the depositors had not made these contracts. He further testified that he had been in the cotton business from 15 to 17 years; that at the time the bank was closed in December, 1921, he had a small deposit in it, and owed it from $15,-000 to $20,000, which he subsequently paid; that he knew Mr. Ulrich, the receiver, and talked with him several times while he was there in charge of the bank, but they never discussed the condition of the bank at their conferences, and Mr. Ulrich never said anything to him with reference to the assessment, double liability assessment, against his stock.

Over the objections and exceptions of the plaintiff, several of the stockholders testified that Mr. Ulrich told them that he had an assessment against their stock; that they would have to pay it or the 110 per cent.; that, if they paid the latter, that payment would discharge their double liability, and that they paid in their 110 per cent. in reliance upon those statements, and would not have done so, if they had not been made. Mr. Ulrich testified that he never made any such statements. Over the objections and exceptions of the plaintiff, several witnesses testified that Mr. Ulrich told them that, if the 110 per cent. was paid in, the bank would be solvent and prosperous, and that they relied upon those statements, and would not have made their payments if they had not been made. A consideration of all the evidence convinces that the Comptroller, Mr. Ulrich, the receiver, the officers and directors of the bank, the depositors and stockholders, who made the representations as to

the solvency of the bank upon the execution of the proposed scheme of resumption, believed that the execution of that plan would make the bank solvent, and did not make those representations in bad faith, with intention to deceive or defraud the defendant or the other stockholders or depositors of the bank, but that, in the light of the unexpected course of subsequent events, the bank was in fact insolvent at the time it resumed business.

Upon this state of the evidence, counsel for the defendant contended, and the court below held, that this case was practically ruled, and the defendant was entitled to the verdict, by the decision and opinion of the Supreme Court in Korbly v. Springfield Institute for Savings, 245 U. S. 330, 38 S. Ct. 88, 62 L. Ed. 326. In that case the Pynchon National Bank, of Springfield, Mass., with a capital stock of $200,000, divided into shares of $100 each, became insolvent. The Comptroller of the Currency appointed a receiver of it, adjudged it in liquidation, and on March 18, 1902, made an assessment on the shareholders of their full statutory liability of 100 per cent., payable on May 15, 1902. It had among its assets bonds of the American Writing Paper Company, of the par value of $577,000, which were worth 65 cents on the dollar. A plan was devised whereby each shareholder should purchase one of these bonds for every three shares of stock owned by him at the price of 95 cents on the dollar. This excess payment of 30 cents on the dollar would amount to 82 per cent. of the assessment of each stockholder. There were three savings banks that were shareholders, and they had no corporate power to purchase these bonds, and for that reason, according to the scheme, they were to pay to the receiver the advance over the market price of the bonds without purchasing their quota of them. This plan was approved by all the shareholders of the bank and by the Comptroller, who by his letter advised the directors of the bank and the shareholders that he was satisfied that, if this sale of the bonds were made, the receiver would be able to pay all the creditors in full. In accordance with this plan the three banks paid to the receiver their respective quotas of the assessment, aggregating $45,499.33. After the shareholders had paid to the receiver this 82 per cent. of their assessment, leaving 18 per cent. unpaid, and on July 2, 1902, the receiver, by direction of the Comptroller, wrote to the shareholders that it was then probable that the payment of the assessment would not be required, and that

the Comptroller had decided to withdraw it. The anticipations of the Comptroller, however, were not realized, and on December 28, 1906, the then Comptroller made a second assessment of $49 on each share of the stock of the bank. The savings banks refused to pay it, and the Supreme Court held that they had paid under the first assessment 82 per cent. of their liability under section 9689, and were liable for only 18 per cent. more.

The argument that this conclusion of the Supreme Court practically rules the case in hand is the argument by analogy. It is that, because in its decision in Korbly's Case that court answered in the affirmative this question, "Was it the understanding that the payments made by the savings banks should be applied on the assessment for their statutory liability, so that they remained liable for only 18 per cent. additional?" this court ought to decide this case in favor of the defendant, because he understood that the 110 per cent. he paid into the bank would be applied to discharge his double liability under section 9689. But in our opinion no such analogy exists. The diverse facts of the two cases exclude it. In Korbly's Case the Comptroller of the Currency considered the financial situation of the bank, and adjudged and placed it in liquidation. In the case in hand he did neither of these things prior to the payment into the bank by the defendant of his 110 per cent. In Korbly's Case the Comptroller made a requisition and assessment of 100 per cent. upon all the shareholders of the bank pursuant to section 9689, and the defendant banks paid 82 per cent. of those assessments to the receiver for the purpose, and they were applied to the object of paying equally and ratably the creditors of the bank. In this case, prior to the payment of his 110 per cent. by the defendant, there was no liquidation adjudged or in operation, no assessment pursuant to section 9689, no payment by the stockholders of any assessment, nor was the payment of the 110 per cent. for the purpose of the application of any of it to the object of paying equably and ratably the creditors of the bank, but it was paid into the bank with the knowledge and intention of the defendant and the other stockholders that it would be and it was used, not to pay its creditors equably and ratably, but to secure resumption of business by the bank and its subsequent operation. At the time of the bank's resumption there were owners of deposits amounting to $167,635 who did not consent to leave their deposits in the bank, and own-

ers of deposits to the amount of $965,310 who did so consent; $214,764.45 in deposits were paid out by the bank during its operation in 1922. Other grave differences in the facts of the two cases might be mentioned, but those already stated are deemed sufficient to demonstrate the lack of a persuasive analogy between the facts of the two cases.

[1, 2] The double liability of a shareholder of a national bank under section 9689 for the payment of its debt is entirely statutory. It attaches, exists, and is enforceable and dischargeable at the times, in the manner, and for the purpose specified in the act of Congress. It attaches and exists for the purpose of creating a fund for the exclusive purpose of paying the creditors of the bank equably and ratably. Delano v. Butler, 118 U. S. 634, 7 S. Ct. 39, 30 L. Ed. 260; Scott v. Deweese, 181 U. S. 202, 21 S. Ct. 585, 45 L. Ed 822; Scott v. Latimer, 89 F. 843, 33 C. C. A. 1. Indispensable conditions precedent to the enforcement of such liability are: First, the adjudication of the Comptroller of the insolvency of the bank and that it is in liquidation; and, second, the adjudication and order of the assessment or requisition on the shareholders of the bank under section 9689. Deweese v. Smith, 106 F. loc. cit. 441, 45 C. C. A. 408, 66 L. R. A. 971; Kennedy v. Gibson, 8 Wall. 498, 505, 19 L. Ed. 476; United States v. Knox, 102 U. S. 422, 425, 26 L. Ed. 216; Bank v. Case, 99 U. S. 628, 634, 25 L. Ed. 443; Casey v. Galli, 94 U. S. 673, 681, 24 L. Ed. 168; Bushnell v. Leland, 164 U. S. 684, 685, 17 S. Ct. 209, 41 L. Ed. 598.

[3-5] As there was no adjudication of insolvency or of a state of liquidation of the bank, and as no assessment was adjudged or made by the Comptroller of the double liability of the defendant until after the 110 per cent. was paid in by the defendant and Mr. Ulrich was discharged as receiver, Mr. Ulrich never acquired or had any jurisdiction or authority to collect, release, waive, or injuriously affect the double liability of the defendant. The defendant and Mr. Ulrich are presumed to have had knowledge of this state of the law, and the evidence leaves no doubt that the defendant, before and when he paid his 110 per cent., although he might have thought that the payment would discharge his double liability, knew that the moneys he paid in would not be, and intended that they should not be, used to satisfy equably and ratably the creditors of the bank, and that they would be used to enable the bank to resume and continue its

business. Consequently his payment could not and did not rise above a voluntary contribution by him to enhance the value of his stock and to enable the bank to resume its business, and it constituted no defense to this suit. Delano v. Butler, 118 U. S. 634, 7 S. Ct. 39, 30 L. Ed. 260; Brodrick v. Brown (C. C.) 69 F. 497; Huff et al. v. Page (C. C. A.) 2 F.(2d) 544.

[6] There is no foundation for the claim that the defendant is relieved of his statutory liability to his creditors by the alleged fact that he was deceived and defrauded into paying his 110 per cent. into the bank by the false and fraudulent representations of its officers and directors relative to its prospective financial condition and the legal effect of that payment. The creditors of the bank were not responsible for the acts or representations of the officers and directors of the bank to their shareholders, and if they defrauded the shareholders their remedy is against them, and not against the creditors of the bank and their creditors. Ryan v. Mt. Vernon Nat. Bank, 224 F. 429, 140 C. C. A. 123; Blakert v. Lankford, 74 Okl. 61, 176 P. 532.

[7] Nor is the plaintiff, the present representative of the creditors of the bank, nor are the creditors themselves, estopped from collecting the assessment subsequently made by the Comptroller in January, 1923, by the fact that many of its depositors in May, 1922, agreed to and did leave their deposits in the bank for six months after it resumed operation on May 18, 1922. The defendant knew before he paid his 110 per cent. that some of the depositors of the bank had made this agreement and that others had not. He knew that they had been induced to make this agreement for the same main object that he was about to pay his 110 per cent., to enable the bank to resume its business, and he knew that the creditors who made that agreement did not intend to, and did not in fact, thereby release the bank from its ultimate liability to pay their claims, or its stockholders from their liability under section 9689 to create a fund to pay them. There is no legal or rational foundation for this claim that the depositors, who made these agreements to extend the time for the payment of their claims, thereby estopped themselves from enforcing the double liability of the stockholders of the bank to pay them, and the conclusion is that the court below fell into a serious error in its instruction to the jury to return a verdict for the defendant.

Other errors are assigned and argued, but

7 F.(2d)—35

the conclusion already reached renders a new trial of this case necessary, and renders a discussion of the questions presented under the other assignments futile.

The judgment below must be reversed, and the case must be remanded to the District Court, with instructions to grant a new trial; and it is so ordered.