**AUSTIN, State Banking Commissioner, v. DUFFER. (No. 1783.)**

(Court of Civil Appeals of Texas. El Paso. Jan. 7, 1926. Rehearing Denied Jan. 28, 1926.)

1. **Banks and banking ⊙=49(9)—Banking commissioner, in suit to enforce assessment on stock held in a bank which had merged with another bank, held entitled to a directed verdict.**

Under evidence showing that bank, of which defendant was a stockholder and director, was insolvent at time it merged with another bank with defendant's consent, under express agreement that he was not to be relieved of liability for assessment, and that assets and liabilities of both banks were so commingled as to make stockholders responsible for debts of both, the banking commissioner, in suit brought after insolvency of merged bank to enforce assessment on stock held by defendant in his bank before the merger, held entitled to directed verdict.

2. **Banks and banking ⊙=63½—Passing of bank, with which defendant's bank merged, into hands of commissioner for liquidation, held to include liability to assessment of stockholders of defendant's bank.**

Under agreement whereby bank, of which defendant was a stockholder and director, merged with another bank, expressly reserving liability of stockholders of each bank for assessments, the passing of merged bank into hands of banking commissioner for liquidation carried with it assets and liabilities of defendant's banks, including liability to assessment of its stockholders.

3. **Banks and banking ⊙=63½—Where two banks merged, liquidating agent of merged bank held to operate in same capacity over each of banks making up the merger.**

Where insolvent bank, of which defendant was a director and stockholder, merged with another bank, liquidating agent appointed for merged bank was also liquidating agent for defendant's bank by reason of all unliquidated assets of defendant's bank passing into his hands when he took over assets of merged bank.

4. **Banks and banking ⊙=47(3)—On merging of defendant's bank with another, defendant held liable for stock assessment after insolvency of merged bank, pursuant to agreement.**

Where bank, of which defendant was a stockholder and director, merged with another bank under agreement providing that stockholders of each of the banks were not to be relieved from liability for any assessment, made in view of the insolvency of defendant's bank and possible insolvency of merged bank, all of the assets of both banks went to state banking commissioner for liquidation on insolvency of merged bank, making defendant liable for an assessment on his stock.

5. **Banks and banking ⊙=47(3)—Stockholder, participating in merging of two banks, cannot question method by which assets came to banking commissioner for liquidation, to avoid liability for stock assessment.**

Where defendant, a stockholder and director of an insolvent bank, aided in its merger with another bank under agreement reserving liability of stockholders of each bank for assessments after insolvency of merged bank, he cannot question method by which assets of his bank reached banking commissioner for liquidation, in order to escape liability on his stock assessment.

6. **Banks and banking ⊙=47(3)—Failure to appoint separate liquidating agent over bank, which merged with another bank, until suit to enforce assessments, held unimportant.**

Where bank, of which defendant was a stockholder and director, merged with another bank, which subsequently became insolvent, fact that banking commissioner did not appoint liquidating agent for defendant's bank as separate and distinct from liquidating agent of merged bank until suit to enforce assessment became necessary is unimportant.

7. **Banks and banking ⊙=49(5)—Assessment on stock of bank 9 months after insolvency of a bank with which it had merged held to have been made in due time.**

Where assets of defendant's bank, merged with another bank, came into the hands of banking commissioner for liquidation assessment, levied against stock of defendant's bank within 9 months after insolvency of merged bank, held to have been made in due time, and to create no estoppel to assert liability to enforce assessment.

⊙=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

8. **Banks and banking ☜63½—Action of banking commissioner in determining insolvency of a bank, and assessment on stockholders, held not subject to judicial review.**

Under state Banking Law (Rev. St. 1911, art. 552, and article 459 [article 455, Rev. St. 1925]) and Const. art. 16, § 16, the action of state banking commissioner in determining insolvency of a bank, and in making assessment against its stockholders, and as to amount of assessment, is not subject to judicial review.

9. **Banks and banking ☜48(1)—Stockholders liable for par value of stock for one year after bona fide transfer thereof.**

Under Const. art. 16, § 16; Rev. St. 1911, art. 552, and article 459 (article 455, Rev. St. 1925), every stockholder of a bank, and for one year after bona fide transfer of his stock, remains bound to creditors of the bank in an amount equal to the par value of his stock, and there can be no hiatus in stock ownership.

10. **Banks and banking ☜47(3)—Knowledge by banking commissioner of merger of two banks held not grounds for estoppel to enforce stock assessment.**

Where bank, of which defendant was a stockholder and director, with his consent, merged with another bank, knowledge by commissioner of the merger is not grounds for estoppel to enforce assessment on stock held by defendant.

11. **Banks and banking ☜47(3)—Stockholder, who consented to merger of his bank with another bank, cannot complain of injury done by hopeless commingling of assets and of assessment on his stock to pay debts of both banks.**

Where insolvent bank, of which defendant was a stockholder and director, with his consent, merged with another bank, which subsequently became insolvent, defendant, agreeing not to be relieved of any liability of stock assessment, cannot complain of any injury done by hopeless commingling of assets of two banks and assessment on stock of his bank, to pay debts of both banks.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Suit by Charles O. Austin, State Banking Commissioner, against Albert Duffer. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

Hawkins, Hawkins & David, of Breckenridge, and Ed. J. Hamner, of Sweetwater, for appellant.

Levy & Evans, of Fort Worth, and L. R. Pearson, of Ranger, for appellee.

HIGGINS, J. Prior to and on June 23, 1921, the Farmers' & Merchants' State Bank, which hereafter will be referred to as the Farmers' Bank, and the Texas Bank & Trust Company, which hereafter will be referred to as the Texas Bank, both incorporated under the banking laws of the state of Texas, were doing business, having their places of business in Ranger, Tex. Both had been sustaining heavy withdrawals of deposits. Neither was in sound condition. The Texas Bank was the weaker of the two. Its officers and directors doubted its ability to continue in business. The officers and directors of the Farmers' Bank feared the consequences to that bank should the Texas Bank go into the hands of a receiver in the then state of public opinion as to the banks in Ranger, and for their mutual benefit, having in mind their respective conditions, on June 23, 1921, they entered into an agreement, which is as follows:

"It is hereby agreed by the directors of the Farmers' & Merchants' State Bank of Ranger, Tex., and the directors of the Texas Bank & Trust Company of Ranger, Tex., that, in order to strengthen their position and to more economically conduct the business of the two institutions, they hereby merge the assets and liabilities of the two institutions by conducting the business of the two banks in the name of the Farmers' & Merchants' State Bank.

"The merger shall take place on the following basis:

" 'The stock of the Farmers' & Merchants' State Bank will be taken over by the new institution at book value and the stock of the Texas Bank & Trust Company will be taken over by the new institution at book value, making a combined stock value of approximately $250,000.

" 'Out of the combined capital, it is proposed to issue $125,000 worth of stock to the new institution, for which stock $50,000 shall be issued to the stockholders of the Texas Bank & Trust Company in such a proportion as its stockholders may agree upon, and $75,000 shall be issued to the stockholders of the Farmers' & Merchants' State Bank in such a proportion as they may agree upon.

" 'The real estate of the two institutions shall be appraised by three disinterested persons, and the value thereof shall be put into the new institution in its relative proportion agreed upon.

" 'The business of the combined institutions shall be conducted under and by the authority of the directors and officers of the combined institutions until such a time as a new charter shall be procured and new directors elected by the stockholders of the new institution.

" 'Until the proposed reorganization can be effected, the assets and liabilities of the Texas Bank & Trust Company shall be placed upon the books of the Farmers' & Merchants' State Bank in such a manner as to fully protect the stockholders of the Texas Bank & Trust Company; their interest in the Texas Bank & Trust Company being carried in a special account for their protection. This account is to be held in escrow until the reorganization is perfected.

" 'The adjustment and consolidation of the books of the two institutions to be left to the active officers of the two institutions.

" 'It is hereby agreed by the directors of the two institutions that nothing in this contract shall be construed in any way to relieve any of the stockholders of the two institutions from their legal liability for any assessment or former obligations in the two institutions.' "

☜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

This contract had not been previously formally authorized by the stockholders of either bank, but no objection appears to have been offered from any source. We think from the entire record it may be assumed all stockholders in both banks informally assented to the contract.

The appellee, Albert Duffer, was a stockholder and director of the Texas Bank at that time and signed the contract above set forth. On that date the Texas Bank ceased to function. It closed its doors and all its movable assets were forthwith removed to the banking house of the Farmers' Bank, including its books of account, its stock book, and all its papers. All the funds and other assets of the two banks were then and thereby completely and hopelessly commingled.

The Farmers' Bank proceeded to accept deposits from the customers of the Texas Bank, paid checks previously or thereafter drawn by depositors of the Texas Bank, collected, renewed, or extended the notes of the debtors of the Texas Bank, in all things dealing with the debtors and creditors of itself and the Texas Bank without discrimination. Of all this the appellee, Duffer, had actual knowledge, and he offered no objection thereto so far as the record in this case shows. As to whether the then state banking commissioner, Ed. Hall, knew of this contract and the proposed action of the two banks prior to or at the time of the execution and consummation of the contract, the evidence is conflicting. There can be no doubt, however, that he did know it immediately thereafter and acquiesced therein, and thereafter in all respects dealt with the Farmers' Bank as if it had come into the possession of the assets of the Texas Bank under the form prescribed by law.

The record does not disclose that any creditor of either bank offered any objection to what was done as above set forth.

The taking over of the state bank by the Farmers' Bank did not have the desired effect of restoring confidence in the banking situation, and following what may be termed a protracted "run," the Farmers' Bank on November 1, 1921, closed its doors by order of its board of directors, and on November 4, 1921, the banking commissioner of the state of Texas took over all the assets of the Farmers' Bank, including the unliquidated assets of the Texas Bank, and thereafter proceeded through a duly appointed liquidating agent to liquidate the bank.

Mr. E. G. Dean, the liquidating agent, found in the Farmers' Bank assets which had previously belonged to the Texas Bank, notes payable to that bank and other assets. The liquidating agent treated all these as belonging to the Farmers' Bank, collected them when possible, and placed the proceeds in his liquidating account. Dean testified it was impossible to segregate the assets which had separately belonged to the two and he made no effort to do so.

In January, 1923, R. Gray Powell succeeded Dean as liquidating agent of the Farmers'. Bank, receiving from Dean all the unliquidated assets which had come into his hands, amounting to about $800,000 in notes, bonds, stocks, and real estate, and all books of account of both banks.

On May 31, 1923, the state banking commissioner appointed Powell liquidating agent of the Texas Bank. Powell testified he did not think it possible to distinguish the assets of one bank from those of the other and he reduced all possible to cash, depositing same to the credit of the liquidating account of the Farmers' Bank. On January ·9, 1922, the state banking commissioner levied an assessment of 100 per cent. on the stockholders of the ·Farmers' Bank.

On July 8, 1922, the state banking commissioner levied an assessment of 100 per cent. against the stockholders of the Texas Bank. No point is made as to the form of this assessment nor the manner of making same. Notice of this assessment was given as required by law, and the appellee, who owned 50 shares of the par value of $100 each of the Texas Bank & Trust Company at the time of the merger with the Farmers' Bank, and who does not appear to have ever disposed of such shares, having failed to pay the amount assessed against him, this suit was brought to enforce such assessment.

The pleadings need not be set forth. They were, in our opinion, sufficient to present the question of appellee's liability for the assessment.

The case was tried by a jury on special issues, and they and the answers of the jury to the several issues submitted are as follows:

"(1) Did the Texas Bank & Trust Company of Ranger, Tex., on or about November 1, 1921, become insolvent? Answer: No.

"(2) Did the Texas Bank & Trust Company of Ranger, Tex., on or about November 1, 1921, default in the payment of any debt then owing by said bank? Answer: No.

"(3) Did the Texas Bank & Trust Company of Ranger, Tex., on or about November 4, 1921, come into the hands of the then commissioner of insurance and banking of the state of Texas, in any manner? Answer: No.

"(4) Did the Texas Bank & Trust Company of Ranger, Tex., during the month of June, 1921, deliver to the Farmers' & Merchants' State Bank of Ranger, Tex., all of its assets of every character upon an agreement that the said assets should thereafter be the property of the Farmers' & Merchants' State Bank of Ranger, Tex., and that said Farmers' & Merchants' State Bank of Ranger, Tex., should thereby assume the liabilities of the Texas Bank & Trust Company of Ranger, Tex.? Answer: Yes.

"(5) Did the Texas Bank & Trust Company of Ranger, Tex., during the month of June, 1921, deliver to the Farmers' & Merchants' State Bank of Ranger, Tex., all of its assets of

every character, and its charter, and did the Farmers' & Merchants' State Bank of Ranger, Tex., at said time assume all the liabilities of every character of said Texas Bank & Trust Company of Ranger, Tex., with the intention then and there that the said assets and liabilities should become the assets and liabilities of said Farmers' & Merchants' State Bank of Ranger, Tex., and that the charter should be surrendered, and that the corporate existence of said Texas Bank & Trust Company of Ranger, Tex., should cease and be merged with the Farmers' & Merchants' State Bank of Ranger, Tex., which as a new institution owning such assets and owning such liabilities of the former Texas Bank & Trust Company of Ranger, Tex., together with those of said Farmers' & Merchants' State Bank of Ranger, Tex., should issue 40 per cent. of its capital stock to the shareholders of said Texas Bank & Trust Company in lieu of their capital stock to be delivered to said Farmers' & Merchants' State Bank of Ranger, Tex., and canceled, and in pursuance of an agreement to that effect? Answer: Yes.

"(6) If you have answered the foregoing question No. 5 in the affirmative, then answer:

"(a) Whether or not said transaction was made in pursuance of such agreement was done or had with the knowledge and consent either then or thereafter upon the part of the then commissioner of insurance and banking of the state of Texas? Answer: Yes.

"(b) Whether or not said transaction so made in pursuance of such agreement was done or had with the knowledge and consent either then or thereafter upon the part of all of the directors, stockholders, creditors, and depositors of each and both of said banks? Answer: Yes."

When the testimony had all been introduced and both plaintiff and defendant had closed, the plaintiff seasonably asked the court to instruct the jury to return a verdict in favor of the plaintiff. This the court declined to do, exceptions were properly reserved, and, in our opinion, this action of the court is all that we need consider. We think the court should have granted the motion of the plaintiff and instructed a verdict in his behalf.

[1] In our opinion there was no issue to submit to the jury in this case. If, under the law, and in such a case as this, the question of the insolvency of the Texas Bank would under any circumstances be proper to submit to the jury, and if the propriety of the commissioner's action in taking over the Texas Bank for liquidation was subject to judicial review, and if the amount of the assessment necessary to pay the debts of the insolvent bank and the action of the commissioner in levying that amount were open for our consideration, we should nevertheless feel constrained to hold the appellee liable herein because from a consideration of all the evidence we cannot escape the conclusion that the Texas Bank was insolvent when it turned over its assets to the Farmers' Bank, and took such action to prevent being closed by the bank-

ing commissioner; that its assets thereafter reached the hands of the commissioner of banking for administration; and that he lawfully made the assessment on which this suit is based.

From a consideration of all the evidence, we are convinced the Texas Bank, through its officers and directors, of which the appellee was one, and with the assent and acquiescence of its stockholders, so commingled its assets with those of the Farmers' Bank, and so charged the Farmers' Bank with liability for its (the Texas Bank's) liabilities, as to make its assets and stockholders responsible to the extent of statutory liability for all the debts, not only of the Texas, but the Farmers' Bank during the remainder of the legal existence of either.

[2] It is insisted by the appellee that the Texas Bank has not passed into the hands of the commissioner in any manner prescribed by law, wherefore he is without authority to levy and collect an assessment against the stockholders of that bank, but we believe, from a consideration of all the evidence, that the legal effect, as well as result in fact, of the passing of the Farmers' Bank into the hands of the commissioner for liquidation on November 4, 1921, was to carry the Texas Bank and its assets and liabilities, including the liability to assessment of its stockholders, into the hands of the commissioner for liquidation and enforcement.

[3] We further believe the legal effect of the appointment of E. G. Dean as liquidating agent for the Farmers' Bank made him, by virtue of the facts and the prior action of the officers and directors of the Texas Bank, liquidating agent for that bank, as he was in fact by reason of all the unliquidated assets of that bank passing into his hands when he took over the assets of the Farmers' Bank.

[4] We cannot escape the conclusion that the state of affairs and the subsequently to be levied assessment was in the minds of the parties executing the instrument of transfer from the Texas to the Farmers' Bank, when they therein expressly provided:

"It is hereby agreed by the directors of the two institutions that nothing in this contract shall be construed in any way to relieve any of the stockholders of the two institutions from their legal liability for any assessment or former obligations in the two institutions."

The appellee signed that contract. It was made in view of the insolvency of the Texas Bank and the possible and probable insolvency of the Farmers' Bank. By virtue of that contract and the action taken under it, the assets were completely and hopelessly commingled. The known insolvency of the Texas Bank and the contemplated and subsequently realized insolvency of the Farmers' Bank carried all the assets of both into the hands of the state banking commissioner for liquidation. The contemplated and provided for assessment followed as a matter of course

in both law and fact, and if all the contingencies above set forth could, under the law, be considered, we should nevertheless hold that the trial court should have instructed a verdict in favor of the plaintiff. But, in our opinion, each and every one of those questions was foreclosed as a matter of law.

[5] There can be no question but that the Texas Bank was insolvent; that its assets were in the hands of the state banking commissioner for liquidation. They may have reached him informally, but they were there. This appellee had aided and actively participated in placing them there, and he should not now be heard to question the method of their reaching the commissioner to enable him to escape the consequences, not only of his own conduct, but the consequences the law imposed on him as a stockholder in an insolvent bank.

The case of In re Receivership of Germania Bank, 91 Minn. 494, 98 N. W. 341, decided by the Supreme Court of Minnesota, is somewhat analogous to this case:

"The Germania Bank of St. Paul was incorporated in 1884, under the General Statutes of this state, with a capital stock of $300,000, which was increased in 1887 to $400,000, and divided into 4,000 shares of $100 each. The bank became insolvent in 1897, and made a general assignment for the benefit of its creditors; the debts amounting at that time to about $750,000. The assignee took possession of the bank, its property and effects, and proceeded to wind up its affairs. Thereafter, in April, 1897, a majority in number and amount of the creditors presented to the district court of Ramsey county, under and pursuant to the provisions of chapter 89, p. 109, Gen. Laws 1897, a plan for the reorganization of the bank. This plan provided, among other things, for the payment of all debts in full, the issuance of new certificates of deposit in evidence of its debts, extending and fixing the time for the payment of overdue obligations, and reduction of the capital stock of the bank to $200,000, and the reopening of the bank for general banking purposes. In this respect the reorganization differs from that considered in Hunt v. Roosen, 87 Minn. 68, 91 N. W. 259. In that case the purpose of the reorganization was to enable the officers of the bank to wind up its affairs, convert its assets into money, and pay and discharge its debts. In the case at bar it was contemplated and intended that the bank should reopen its doors for general banking business, and such was the final result. After a proper hearing the court below adopted the proposed plan of reorganization, and judgment to that end was entered in August, 1897. The new capital stock of $200,000 was raised in the manner provided by the plan of reorganization, and a large number of the holders of stock in the old bank subscribed and paid for stock in the new one, and new stock was issued and delivered to them. Some of the old stockholders declined to go into the reorganization proceedings. Some transferred their stock before the plan of reorganization was adopted. Subsequent to the judgment adopting the plan the assignee transferred and delivered to the officers of the bank all the property and effects in his hands as assignee. The new bank began business, and the assignee was discharged. Certificates of deposit were issued to the creditors in settlement of their claims against the old bank, and a considerable amount of such debts was thereafter paid by the new concern. On July 24, 1899, the bank became insolvent, and in proceedings brought for that purpose a receiver was appointed, who thereafter duly qualified and entered upon the discharge of the duties of his office. At the time of his appointment the debts of the bank aggregated in round numbers $344,000, the larger proportion of which represented debts and liabilities contracted and incurred by the new bank; the balance represented debts of the old bank yet unpaid. It is unnecessary to ascertain at this time the exact amount of the old and the new debts. The record is not clear. The parties are not agreed on the question, and the trial court made no specific finding thereon. The assets in the hands of the receiver being insufficient to pay all the debts, on July 27, 1903, a petition was presented to the court below as follows: 'That it would consider and determine the probable indebtedness of said bank, the expenses of said receivership, the probable amount of assets available for the payment of said indebtedness and expenses, as to what parties are or may be liable as stockholders of said bank, and the nature and extent of their liability; and that the court would, by order, judgment, or decree, direct and levy a ratable assessment on all parties liable as stockholders.' The petition came on for hearing after due notice to the stockholders, and was opposed by the appellants, stockholders in the old, but not in the new, bank, on the grounds, among others: (1) That the issuance to the creditors by the reorganized bank of new certificates of deposit for the amounts due them was a payment of such debts, and operated as a release and discharge of all stockholders who took no part in the reorganization proceedings and did not become stockholders in the new bank; (2) that the stockholders of the new bank are primarily liable for all debts of the bank, past or present, and that no assessment should be made against appellants until the remedies against those primarily-liable are first exhausted. Appellant Mann was a stockholder in the old bank, but had transferred his holdings prior to, but within a year of, the first assignment. Appellants Moss and Petzhold were stockholders in the old bank, but did not participate in the reorganization proceedings, or become stockholders in the new concern, and their stock was canceled in the manner provided by the plan of reorganization. So that, if their contention that the issuance of certificates of deposit by the new bank to all the creditors operated to release and discharge the stockholders of the old bank who did not become members of the new be sound, no assessment should be made against them; or, if this be not so, and the stockholders in the new bank are primarily liable for all debts, old or new, and the remedy against them should be first exhausted, they are in position to insist that the receiver so proceed. The trial court overruled their objections, and made a general order assessing all stockholders in both the old and the new bank 100 per cent. of the amount of their holdings, from which order this appeal was taken. * * *

(279 S.W.)

"1. Taking up the questions in the order in which they are stated above, we have for consideration, first, whether the issuance by the reorganized bank of certificates of deposit as evidence ·of its debts, and their acceptance by the creditors, operated as a payment of the debts and the discharge of all the old stockholders from further liability for their payment. We are of the opinion that this question should be answered adversely to appellants. Whether a promissory note or other contract for the payment of money given and received in place of an overdue note or contract was intended by the parties as a payment and discharge of the old debt is always a question of·fact to be determined from the facts and circumstances surrounding the transaction, and thus the question at bar must be determined. The purpose of the reorganization was to put the bank on its feet, and enable it to continue its business; and the proposed plan of reorganization expressly provided for taking up the old debts by the issuance of certificates of deposit by the new bank, and this was agreed to by all parties taking part therein. That it was· not their intention thus to pay and discharge the debts is made manifest by the final judgment of reorganization, which expressly preserved and continued the liability of all stockholders, both of the old and the new bank, for the payment of all debts. That judgment became a part of the contract between the parties resulting from the reorganization proceedings, and conclusively rebuts any inference of payment that might arise from the issuance and acceptance of new certificates. The creditors must, in view of the terms of the judgment, be deemed to have accepted·the new evidence of their claims upon the terms of the judgment that 'no stockholder, present or past, shall in any way, or to any extent, be released from any existing liability.' Whether this provision of the judgment be binding upon the stockholders as respects their present liability or not, it is conclusive that the creditors did not accept the new certificates of deposit as payments of their claims. The case in that respect is not unlike Hunt v. Roosen, 87 Minn. 68, 91 N. W. 259, and is clearly distinguishable from Seymour v. Bank of Minnesota, 79 Minn. 211, 81 N. W. 1059. We therefore hold that the stockholders in the old bank, who took no part in the reorganization and did not become stockholders in the new bank, were not discharged from liability for the debts of the 'old bank by the issuance, under the circumstances stated, of certificates of deposit by the new bank for the old debts."

It will be observed that in that case, as in this, the liability of the old stockholders was expressly preserved. Approving as we do the reasoning and result in that case, we think it sustains the conclusion reached in this.

The case of Security State Bank v. Gannon, 39 S. D. 232, 163 N. W. 1040, is one growing out of the efforts of an insolvent bank to save itself by reorganization. The effort failed, and the stockholders, old and new, were held liable to assessment for all the debts; the new having taken over the assets of the old bank, and thereby made themselves liable, and the old not having been released from their statutory liability. That is what has been done in the instance out of which this case arises, only done in a different way. The principle is the same.

[6] The fact that the commissioner did not appoint a liquidating agent for the Texas Bank as separate and distinct from the liquidating agent for the Farmers' Bank until the suits to enforce the assessments became necessary is not important.

[7] The case of Harris v. Briggs, 264 F. 726, although a decision of the United States Circuit Court of Appeals for the Eighth Circuit, is one construing our banking law, and in a well-considered opinion the court holds the right of the state to enforce the liability to assessment continues until the debts of the bank are paid (within legal limitations as to amount), and that the judgment and action of the commissioner in making the assessment, the amount of it, and time when such assessment should be made are conclusive on all persons and courts. That case is authority for holding the assessment in this case was made in due time, and we so hold.

[8] So far, we have proceeded on the theory that the action of the state banking commissioner in determining the Texas Bank & Trust Company was insolvent, and in making an assessment against the stockholders thereof, and as to the amount of that assessment, was subject to judicial review, but, in our opinion, such is not the case.

An examination of the state banking law in all its parts, leaves no room to doubt that the people in adopting the constitutional amendment authorizing the incorporation of state banks, and the Legislature in carrying out the will of the people expressed in the constitutional amendment, provided and intended to provide for a strict supervision of the business of banking within this state under an executive officer clothed with all the necessary power to investigate the condition of the banks, to regulate the conduct of their business, to determine when they could no longer safely transact business with due regard to the security of those doing business with them, and to find the facts necessary to the exercise of such powers. One of the most important of all those functions is the power of assessing the stockholders of the bank to meet its obligations.

The Constitution provides (section 16, article 16):

"Each shareholder of such corporate body incorporated in this state, so long as he owns shares therein, and for twelve months after the date of any bona fide transfer thereof, shall be personally liable for all debts * * * to an amount additional to the par value of such shares so owned or transferred, equal to the par value of such shares so owned or transferred."

Article 552 of the Revised Civil Statutes is a legislative declaration of the liability created by the Constitution as above set forth.

Article 459, R. S. 1911 (article 455, R. S. 1925), provides:

"The commissioner may, if necessary to pay the debts of such state bank, enforce the individual liability of the stockholders."

It has been held in Austin v. Campbell (Tex. Civ. App.) 210 S. W. 279, and Chapman v. Pettus (Tex. Civ. App.) 269 S. W. 268, that this provision of our Constitution is self-executing. Similar provisions have been so held by the Supreme Court of the United States in Davis v. Burke, 179 U. S. 401, 21 S. Ct. 210, 45 L. Ed. 249, and Converse v. Hamilton, 224 U. S. 253, 32 S. Ct. 415, 56 L. Ed. 749, Ann. Cas. 1913D, 1292. The liability of the stockholders is fixed by the Constitution itself. Houston Bank v. Chapman (Tex. Civ. App.) 263 S. W. 933. Only the necessity of enforcing the liability is left to the state banking commissioner.

[9] We do not conceive it to be subject to controversy that it is the purpose of the state, as expressed both in the Constitution and the statutes, that every stockholder while he remains a stockholder of the bank, and for one year after his bona fide transfer of his stock, shall remain bound to the creditors of the bank in an amount equal to the par value of the stock held by him, and that there can be no hiatus in stock ownership. In other words, that until a stockholder has paid to the creditors of the bank through the commissioner, of course, an amount equal to the par value of the stock held by him, he cannot escape liability therefor, unless that liability has been assumed by some one else by the acquisition of the stock and that assumption has in good faith existed for 12 months after the bona fida transfer.

It has been held that the provisions creating this liability, both the provisions of the Constitution and of the statutes, not only as to the liability of the stockholders for the debts of state banks, but those providing a method for the enforcement of such liabilities, have been based upon or were actually taken from the provisions of the acts of Congress of the United States regulating national banks. Collier v. Smith (Tex. Civ. App.) 169 S. W. 1111; McWhirter v. Bank (Tex. Civ. App.) 182 S. W. 684; Stringfellow v. Patterson (Tex. Civ. App.) 192 S. W. 557; Brooks v. Austin (Tex. Civ. App.) 206 S. W. 725; Houston Bank v. Chapman (Tex. Civ. App.) 263 S. W. 933. This being true, we may well look to the decisions of the Supreme Court of the United States for the proper rule of construction of those provisions, constitutional and statutory.

We believe we are justified in saying that there is an unbroken line of decisions from Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476, to Korbly v. Springfield, 245 U. S. 333, 38 S. Ct. 88, 62 L. Ed. 326, holding the Comptroller of the Currency of the United States, whose powers over national banks are similar and in many respects identical with the powers of the state banking commissioner over state banks, is authorized to decide when it is necessary to institute proceedings against the stockholders to enforce their personal liability, and whether the whole or a part, and if only a part, how much shall be collected. These questions are referred to his judgment and discretion, and his determination is conclusive. The stockholders cannot controvert it. It is not to be questioned in the litigation that may ensue. He may make it at such time as he may deem proper, and in such amount as shall be satisfactory to him, not to exceed 100 per cent., however. Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476; Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Casey v. Galli, 94 U. S. 673, 24 L. Ed. 168; Studebaker v. Perry, 184 U. S. 261, 22 S. Ct. 463, 46 L. Ed. 528; McClaine v. Rankin, 197 U. S. 154, 25 S. Ct. 410, 49 L. Ed. 702, 3 Ann. Cas. 500; Christopher v. Norvell, 201 U. S. 222, 26 S. Ct. 502, 50 L. Ed. 732, 5 Ann. Cas. 740; Korbly v. Springfield, 245 U. S. 333, 38 S. Ct. 88, 62 L. Ed. 326.

In Kennedy v. Gibson, supra, it was said:

"It would be attended with injurious consequences to forbid action against the stockholders until the precise amount necessary to be collected shall be formally ascertained. This would greatly protract the final settlement, and might be attended with large losses by insolvency and otherwise in the intervening time. The amount must depend in part upon the solvency of the debtors and the validity of the claims. Time will be consumed in the application of these tests, and the results in many cases cannot be foreseen. The same remarks apply to the enforced collections from the stockholders. A speedy adjustment is necessary to the efficiency and utility of the law. The interest of the creditors require it, and it was the obvious policy and purpose of Congress to give it. If too much be collected, it is provided by the statute that any surplus which may remain after satisfying all demands against the association shall be paid over to the stockholders. It is better they should pay more than may prove to be needed than that the evils of delay should be encountered."

In Korbly v. Springfield, supra, the court declared:

"From the earliest days of the administration of the National Banking Act to this case, attempts have been made in many forms to give it a technical construction which would so restrict the powers of the Comptroller as to greatly delay and impede the settlement of the affairs of insolvent banks. But this court has uniformly declined to narrow the act by construction and has placed a liberal interpretation upon its provisions to promote its plain purpose of expeditiously and justly winding up the affairs and paying the debts of such unfortunate institutions."

In Collier v. Smith, supra, the Court of Civil Appeals for the Seventh District used the following language:

(279 S.W.)

"The Supreme Court of the United States has uninterruptedly, without the necessity of citations, adhered to the rule announced in the Kennedy-Gibson Case; and, when the Legislature of this state adopted the act of the federal Congress with reference to the particular question under discussion, it adopted the construction by the Supreme Court of the United States given to the federal act. If there is something incorporated into the statute, or if there is a legislative purpose exhibited in any act germane to the same subject-matter, indicating that the construction given by the courts of the country, from which the act was borrowed, should not prevail, the uniform construction given to the act borrowed does not prevail. There is nothing indicated, however, in the acts of the Legislature pertaining to this subject-matter that any different rule of construction should prevail with reference to the statute under consideration; hence the settled and uniform construction by the Supreme Court of the United States is a part of this law. Morgan v. Davenport, 60 Tex. 230."

We have read the cases of McWhirter v. Bank (Tex. Civ. App.) 182 S. W. 682; Stringfellow v. Patterson (Tex. Civ. App.) 192 S. W. 557 (in which a writ of error was refused); Houston Bank v. Chapman (Tex. Civ. App.) 263 S. W. 933; Chapman v. Denton (Tex. Civ. App.) 268 S. W. 259; Chapman v. Pettus (Tex. Civ. App.) 269 S. W. 268; Austin v. Campbell (Tex. Civ. App.) 210 S. W. 279; Brooks v. Austin (Tex. Civ. App.) 206 S. W. 725 (in which a writ of error was refused); Tyler County Bank v. Rhodes (Tex. Civ. App.) 256 S. W. 950. We are persuaded that the rule therein announced is in entire harmony with the rule as announced by the Supreme Court of the United States in cases above cited.

We are aware of the fact that, in the case of Pool v. Austin (Tex. Civ. App) 271 S. W. 427, in which the incontestability of the action of the state banking commissioner in enforcing an assessment for the purpose of paying debts, existing at the time a transfer of stock was made, a writ of error has been granted by the Supreme Court. Whether any distinction, in fact, exists between the assessment for the purpose of meeting presently existing debts and debts existing at the time of the transfer of stock, we are not called on to determine. Suffice it to say that in our opinion the Texas Bank & Trust Company, when the assessment involved in this controversy was made, was lawfully in the hands of the state banking commissioner for liquidation as an insolvent bank; that the commissioner made the assessment, and, having done so, we are without authority to set aside his action in so doing. The appellee was a stockholder in that bank when all of its assets were, with his approval and by his action, commingled with the assets of the Farmers' Bank. The Texas Bank at that time was insolvent. The Farmers' Bank soon became insolvent. The appellee realized, in transferring the assets of the Texas Bank to the Farmers' Bank for administration, that an assessment might be necessary against the stockholders of both banks to meet the liability imposed upon them as stockholders by the Constitution and the laws of this state. He expressly provided that he was not to be relieved from his legal liability to such assessment. He has not met that liability by paying the assessment, and therefore the judgment which the court, under the law and under the undisputed facts, should have rendered, was one enforcing that liability.

[10] We fail to see how there can be any question of the commissioner being estopped from asserting the liability of the appellee to this assessment. We are by no means clear that an estoppel could exist in any case as against the banking commissioner from assessing stockholders of insolvent banks, but that we need not pass on. Harris v. Briggs, supra, is ample authority for holding that the mere lapse of time in making the assessment could not operate an estoppel. The knowledge of the commissioner that the Texas Bank and the Farmers' Bank were merging, though informally, could not be the ground for estoppel because the appellee assented to that merger. He wanted it, he signed the instrument under which the two banks were merged, and provided for the continuance of his liability to assessment in the very instrument under which the merger was made. There is no element of estoppel in the case.

[11] The hopeless commingling of the assets of the two banks was an inevitable result of the conduct of the appellee and his associates on their respective boards of directors. That the Commissioner treated all of the assets of both banks that came into his hands without reference to the source from which they came, for the purpose of paying the liabilities of both banks, was a natural consequence of the action of the directors in commingling the funds. If injury has been done to the appellee, it was done by his own action, and he should not now be heard to complain. Both banks were insolvent. The commissioner so found. An assessment was necessary to enable the commissioner to pay the debts of the two banks.

The situation of the stockholders, and especially those in authority like the appellee, was of their own making. We see no reason why the stockholders, and especially the directors, who actually and actively participated, should escape their statutory liability and the banks' creditors go unsatisfied because these financial chefs, in the effort to make one good omelet out of two bad eggs, hopelessly scrambled the eggs.

The facts in this case have been fully developed, and, for the reasons above indicated, the judgment will be reversed and here rendered for appellant.

Chief Justice PELPHREY did not participate in this decision.

Reversed and rendered.