## HOWARD et al. v. REPUBLIC BANK & TRUST CO. et al.
### No. 8006.

Court of Civil Appeals of Texas. Austin.
Oct. 24, 1934.

**188**

John Bullington, of Houston, A. N. Moursund, of San Antonio, and Cofer & Cofer, of Austin, for appellants Eugene Howard et al.

Wright Stubbs and A. M. Felts, both of Austin, for appellants Albert Taylor and R. D. Parker.

Fred S. Rogers, of Austin, for appellee Banking Com'r of Texas.

Hart, Patterson & Hart, of Austin, for appellee Texas Bank & Trust Co.

Geo. E. Shelley, of Austin, for appellee Republic Bank & Trust Co.

BAUGH, Justice.

This case arose as follows: The Texas Bank & Trust Company and the Republic Bank & Trust Company (hereafter designated as the Texas Bank and the Republic Bank, respectively) were, in June, 1932, duly incorporated state banks, each with a capital stock of $200,000, divided into shares of $100 each, doing business in the city of Austin. In the latter part of June, 1932, the Texas Bank was in a distressed financial condition, and, under the authority and approval of the boards of directors of the two banks and of the state banking commissioner, entered into the following contract with the Republic Bank:

"The State of Texas, County of Travis. ss.

"This contract, made and entered into on this the 27th day of June, 1932, by and between the Republic Bank and Trust Company of Austin, Texas, a banking corporation organized and doing business under the laws of the State of Texas, hereinafter called First Party, and the Texas Bank and Trust Company, a banking corporation organized under the laws of the State of Texas, hereinafter called Second Party, both of said corporations having been lawfully authorized by resolutions of their respective Boards of Directors, duly adopted, to make and enter into this contract, Witnesseth:

"The First Party in consideration of the agreements of the Second Party, hereinafter set out, has assumed, and does hereby assume the payment of all liabilities and the discharge of all obligations of the Second Party, with the exception of the liabilities of the Second Party to its stockholders as such, and also those certain notes hereinafter described which have this day been executed and delivered by the Second Party to the First Party. The Second Party hereby acknowledges its liability to its creditors as continuing and undiminished and acknowledges itself to be indebted to the First Party for the full amount of all liabilities and obligations so assumed by the First Party. It is expressly understood and agreed that the assumption of such liabilities and obligations by the First Party is undertaken for the benefit of the creditors of the Second Party holding such obligations, but, as between the parties to

this agreement the liability of the Second Party is primary, and that the First Party is hereby subrogated to all rights of any and all such creditors whose obligations against Second Party are so hereby assumed.

"In further consideration of the agreements of First Party hereinabove set out, the Second Party has sold, transferred, assigned and delivered, and by these presents does hereby sell, transfer, assign and deliver, unto the First Party all of the Second Party's assets of every character and description, including all of its property of every kind, real, personal and mixed, and its choses in action.

"The Second Party agrees to cause to be executed and delivered by its proper officers to the First Party, any and all deeds, transfers, bills of sale or other instruments of conveyance necessary or proper to place of record the title to the property, or any part thereof hereby sold and conveyed.

"In further consideration of agreements of the First Party herein set out, the Second Party has this day executed and delivered to the First Party, its six certain promissory notes of even date herewith, payable to the order of the First Party on demand, and being numbered one to six, inclusive, for the following amounts: Note Number One, Fifty Thousand Dollars, Note Number Two, Twenty Thousand Dollars, Note Number Three, Fifteen Thousand Dollars, Note Number Four, Five Thousand Dollars, Note Number Five, Twenty-five Thousand Dollars, and Note Number Six, Ten Thousand Dollars.

"The Second Party agrees that the only source of payment of the above notes, or any of them, is such assessments against the stockholders of the Second Party as may hereafter be made and collected.

"In testimony whereof, the parties hereto have caused this instrument to be executed by their respective presidents and attested by their common corporate seals, on this the 27th day of June, A. D. 1932.

"[Seal] Republic Bank & Trust Company of Austin

"Attest: By Eldred McKinnon, Pres.
 "Leo Kuhn First Party
 "Cashier

"[Seal] Texas Bank & Trust Company of Austin

"Attest: By Sam Sparks, Pres.
 "H. A. Turner Second Party."
 "Cashier.

.Pursuant to this contract all of the assets of the Texas Bank were transferred to the Republic Bank and $125,000 in notes duly executed by the Texas Bank. On June 30, 1932, the board of directors of the Texas Bank passed a resolution declaring the bank insolvent and placing it in the hands of the state banking commissioner for liquidation. On July 1, 1932, the state banking commissioner levied a 100 per cent. assessment against the stockholders of the Texas Bank.

This suit was filed on September 27, 1932, by twenty of the stockholders of the Texas Bank, as owners of 575 shares of stock in said bank, against the Texas Bank, the Republic Bank, and the state banking commissioner, to set aside said contract as illegal and void, to have a receiver appointed to liquidate said Texas Bank, and to enjoin the collection of the assessments made by the state banking commissioner against the stockholders of the Texas Bank.

The grounds of attack upon the validity of said contract were: (1) That it amounted to a voluntary assignment by the directors and officers of all of the assets of the Texas Bank while same was wholly solvent, without the consent of the stockholders as required by law; (2) that, even if said Texas Bank were insolvent, the directors were not authorized to make such assignment without the consent of the stockholders, which was not obtained; (3) that said two banks, through their officers and directors, and the state banking commissioner, fraudulently conspired and colluded together to wreck the Texas Bank and to get possession of its assets for the use and benefit of the Republic Bank, to the prejudice and injury of the stockholders of the Texas Bank, without their knowledge and consent, and, through threats by the banking commissioner to close the Texas Bank unless said assignment were made, procured the execution of said contract.

The attack on the assessment levied against the stockholders of the Texas Bank was made on the grounds that the officers and directors of said bank were not authorized to execute said notes for $125,000, payable to the Republic Bank, and hence said notes were void; that they were executed pursuant to the fraudulent conspiracy alleged; that the officers and directors had no authority to assign as an asset of said Texas Bank the liability of its stockholders, which said contract undertook to do; that said Texas Bank was never in fact taken over by the state banking commissioner for liquidation as required by law; that said levy was never made according to law, and was therefore void.

Trial was to a jury, and at the close of plaintiffs' evidence on motion of defendants

the court instructed a verdict for all defendants, and rendered judgment accordingly; hence this appeal. Facts essential to the disposition of the issues raised on this appeal will be stated in discussing such issues.

■ The first contention made by appellants is that there was sufficient evidence to go to the jury on the solvency vel non of the Texas Bank, and that therefore it was error to instruct a verdict for the defendants. While we are inclined to the view that there was no competent evidence of any probative value that the Texas Bank was solvent on June 27th, when the assignment was made, and that the evidence rather conclusively showed the contrary, under the uncontroverted facts as to the condition of said bank at that time, we have concluded that the action of its directors was valid without the assent of the stockholders, in any event.

The following facts were shown without substantial controversy: The regular statement of the Texas Bank on December 31, 1931, showed cash on hand and with other banks on that date amounting to $220,270, while on June 25, 1932, the last day said bank was open for business, it had only $73,890. On December 31, 1931, it had individual deposits of $1,177,837, and on June 25, 1932, $887,689. On December 31st state deposits in said bank amounted to $744,734, and on June 25th to $324,307. The state deposits were secured by $100,000 face value of city of Edinburg bonds, and $199,000 Joint-Stock Land Bank bonds. In April or May, 1932, the state treasurer, having become convinced that these bonds were not adequate security for the state deposits, began a systematic withdrawal of the state funds from said bank. This course threatened the cash reserve of the bank, and its officers enlisted the aid of the banking commissioner to induce the state treasurer to cease withdrawals, and the treasurer for a time did cease to withdraw state funds. But in June, 1932, he again began systematic withdrawals, reducing said fund on June 25th to about $325,000. Meantime the Texas Bank officials were unable to secure loans, or to get some other bank in Austin to take over its business. The banking commissioner became fearful of its solvency and lent his assistance in the premises, in an effort to avoid closing said bank and causing a loss to the depositors. Having reached the conclusion that said bank was insolvent when it closed its doors on Saturday, June 25th, and in the interest of the depositors, negotiations were entered into, at the instance of the officers and directors of the Texas Bank with those of the Republic Bank, for the latter to take it over. These negotiations were conducted in the offices of the banking commissioner all day Sunday, June 26th, and until after midnight, when the above contract was executed. The circumstances confronting the directors of the Texas Bank at that time were: Losses in its bank's assets, as estimated by the banking commissioner, of $360,199, with capital, surplus, and undivided profits of $279,395, leaving a deficit of $80,803. It had demand deposits of at least $1,350,000, with only $34,254 cash on hand and $39,636 in other banks, which was far below the reserve required by law to be kept against deposits. A further withdrawal by the state treasurer was expected on Monday, June 27th. If that should amount to as much as 10 per cent. of the state's demand deposit, it would wipe out all of the Texas Bank's cash on hand. In the face of these circumstances, the banking commissioner had informed the officers, directors, and several of the principal stockholders of the Texas Bank who were called into the Sunday conference that, if said bank undertook to open its doors on Monday morning in that condition, he would close the bank, and that not only would an assessment be necessary against the stockholders, but a loss to the depositors would probably result. The Austin National Bank had refused about two weeks before that time to take over said bank, and the Republic Bank refused to take it over except on the terms set out in said contract.

■ The principal losses estimated by the banking commissioner were in the bonds named. It is not controverted that the quoted market value of the Joint-Stock Land Bank bonds was from 32 to 39 per cent. of their face value. The city of Edinburg bonds had no market value. While Albert Taylor, who was in active charge of the Texas Bank, did testify that their real value was 100 per cent., he based his opinion on the fact that they were due in the future and would be paid at maturity. The evidence showed, however, that the bonded indebtedness of the city of Edinburg was $800,000 in excess of its total property valuation, and that two years' interest on its bonds was already in default. His testimony was therefore purely opinion, and of little or no probative force. Regardless of the value of said bonds, however, it was admitted that the city of Edinburg issue was not marketable. And, even if the value of the assets of said bank equalled or slightly exceeded its liabilities, and notwithstanding it had remained open on Saturday, June 25th, and had up to that date paid checks drawn upon it, and even though the banking

commissioner had not closed its doors on Monday morning, its cash reserve, already greatly impaired and less than required by law, would undoubtedly have been exhausted that day, and such a condition was admittedly expected by its officers and directors. The bank would have been forced to close in any event because of inability to pay its depositors on demand in the usual course of its business. Such a condition under the well-settled rule would have rendered the bank insolvent on that day, if in fact it was not already insolvent. It was then clearly obvious that said bank could no longer meet its obligations, and thus would become insolvent in contemplation of law. 7 C. J. 727, and cases there cited; Turkey State Bank v. Estelline State Bank (Tex. Com. App.) 272 S. W. 775; First National Bank v. Neel (Tex. Civ. App.) 10 S.W.(2d) 408, 411.

Even if it be conceded that said bank was not on June 25th actually insolvent, we think that it was conclusively shown under the facts above outlined that a state of insolvency was immediately imminent and impending, and that further continuation of its business as a going concern longer than a day or two at most was an impossibility recognized and admitted by its officers and directors, and by the banking commissioner. Any attempt to comply with article 539, R. S. 1925, governing the closing of a solvent bank by giving the stockholders 60 days' notice of a meeting for that purpose, would undoubtedly have been disastrous. Nor does the contract in question come under the condemnation of article 531, R. S. 1925, prohibiting a bank from making a voluntary general assignment. That a bank in failing circumstances may make such assignment to another bank which assumes its liability in spite of said article was expressly held in Tatum State Bank v. Woolworth (Tex. Com. App.) 65 S.W.(2d) 284, 285.

■ While the general rule is well settled that the directors of a solvent corporation cannot dispose of all of the corporation's assets without first obtaining the consent of the stockholders, there is also a well-recognized rule that, where a corporation is in failing circumstances and its business can no longer be carried on profitably, or where an emergency exists wherein delay would prove disastrous to its creditors, the directors may validly do so without the consent of the other stockholders. In the absence of fraud or oppressiveness, such assignment is not subject to attack by minority stockholders. 4 Thompson on Corps. (3rd Ed.) § 2498, p. 103, and § 2509, p. 121; 14 C. J. 866; Oskaloosa State

Bank v. Mahaska County State Bank, 205 Iowa, 1351, 219 N. W. 530, 60 A. L. R. 1208, and annotations; City National Bank of Huron v. Fuller (C. C. A.) 52 F.(2d) 870, 79 A. L. R. 71, and annotations; Richter v. Laredo Nat'l Bank (C. C. A.) 62 F.(2d) 289. And where, as in the instant case, the transaction was accomplished at the instance of the failing bank, with the approval of the state banking commissioner, and for the admitted purpose of protecting the depositors and creditors of the Texas Bank, there appears every reason under the authorities cited to sustain such assignment.

■■ Appellants next contend that the assignment was invalid because it was contemplated that Sam Sparks, H. A. Turner, Herman Brown, and Z. T. Scott, who were directors of the Texas Bank, were to become officers and directors of the Republic Bank. We find no evidence that any such proceeding was contemplated at the time the contract was made, or that said directors owned, or contemplated the purchase of, any stock in the Republic Bank. The contract itself contains no such indications. The connection of said directors with the Republic Bank arose on or subsequent to June 30, 1932. The mere fact Sparks and Turner, who had been active officers of the Texas Bank, subsequently became connected in an official capacity with the Republic Bank, constitutes no proof that a previous arrangement to that effect was made or contemplated. Even if such relationship had been contemplated, it would not, in the absence of a showing of fraud, have invalidated the assignment. The contract provided that the Texas Bank of which they were stockholders and liable to assessment as such was to remain liable for the payment of its obligations. And it was but natural that, in discharging the obligations of the Texas Bank, the Republic Bank which had taken it over should seek to utilize the services of those most familiar with its affairs.

■■ Appellants next urge that the execution of the six notes by the Texas Bank for the aggregate amount of $125,000, payable only out of stock assessments, the first $50,000 to go to the Republic Bank, the next $40,000 to be prorated $20,000 to the American National Bank, $15,000 to the Austin National Bank, and $5,000 to the Security Trust Company, the next $25,000 to go to the Republic Bank, and the next $10,000 to the Austin National, was violative of article 532, R. S., and prevented the application of the bank's assets as provided by law and gave preference to one creditor over another.

The transaction in question was obviously not intended to prevent the application of the assets of the Texas Bank to the payment of the obligations of that bank. They were transferred to Republic Bank, and were still liable for the payment of such obligations. In addition, the Republic Bank became liable for all of those obligations except the $125,000 in notes executed by the Texas Bank at the time as part consideration for the assumption by the Republic Bank of those obligations. And as a result of the transfer, the Republic Bank subjected its own assets, in addition to those of the Texas Bank, to the payment of the combined obligations of the two banks. The creditors of the Texas Bank, who were threatened with loss, were thereby saved and their interests protected. Protection of depositors and creditors is obviously the purpose of article 532, and such statutes should be construed in keeping with that purpose. Tatum State Bank v. Woolworth, supra. A strict construction of article 532 as urged by appellants would make it impossible for one bank to take over another in failing circumstances. In construing article 531, the Commission of Appeals held in the Woolworth Case that it did not apply to cases where the purchasing bank assumed the liabilities of the failing bank. The same construction applies with equal force to article 532.

And, in view of the conditions confronting the Texas Bank, in the exercise of their discretion when confronted with such emergency, and for the purpose of protecting their depositors and creditors from loss which indubitably would have followed had the bank been closed and liquidated by the banking commissioner, we think the directors were clearly authorized to incur this additional indebtedness against the Texas Bank in order to procure the execution of said contract. The provision as to the method of payment will be discussed later.

 Appellants earnestly insist that there was ample evidence to go to the jury on the issue of fraud. We will not undertake to set out the testimony relied upon. In the main, it was that the banking commissioner excessively undervalued the assets of the Texas Bank; the testimony of Albert Taylor that the assets in question were worth par; that the Republic Bank was in a strained financial condition and showed a deficit of some $32,000, which, appellants charge, was added to the deficit of the Texas Bank in estimating the losses to be made up in the assignment in question; and the bank statements issued by the respective banks before and after the consolidation showing their condition.

All of this evidence relative to the fraud alleged against the Republic Bank was excluded as to that bank, and no complaint is made here as to its exclusion. The bank statements are of little probative value because they reflected only the face value of such assets. It was shown without question that many of the assets of the Texas Bank were not worth their face value. Taylor himself estimated a loss to the Texas Bank of $47,000 in its loans and discounts. The banking commissioner estimated that loss at $60,000. The $32,000 deficit in the Republic Bank was shown to have been made good by its stockholders, and had no relation to the $125,000 in notes. The matter of the Texas Bank's losses on its bonds has already been adverted to. While the testimony of Taylor and the banking commissioner differed as to the extent of depreciation on real estate and of real estate security on notes owned or guaranteed by the Texas Bank, of which latter class there were outstanding more than $400,000, it is a matter of common knowledge that such values had at that time greatly depreciated. The banking commissioner's estimate, based upon his examination of said bank, showed a total loss in assets of $360,000, a deficit of $80,800, and an additional $49,000 in loans and discounts of doubtful value. In brief, we find no competent evidence of fraud on the part of the banking commissioner in the premises; but rather, we think, an indulgent and helpful attitude on his part in permitting and assisting the Texas Bank to remain open as long as it did. When its condition became critical on June 25, 1932, and the Republic Bank was solicited to take it over and apprised of the banking commissioner's estimated deficit of $80,800, and $49,000 in notes of doubtful value, the Republic Bank declined to assume its liabilities without what it deemed adequate protection provided for in said contract. The possibility that some of the assets as appraised by the commissioner might thereafter enhance in value is no evidence of fraud on his part in fixing their value in accord with then existing conditions. His duty was to protect the creditors and depositors against loss, not the stockholders. It was equally possible that such values might continue to decline. Indeed, it is now historically known that banking conditions did thereafter continue to grow worse, and bank failures continued to increase until the President of the United States found it necessary to temporarily close all banks in March, 1933,

to prevent a collapse of the entire banking structure of the nation.

We think there can be no doubt that the Texas Bank was, under the circumstances, and to prevent loss to its depositors and creditors, authorized to execute the additional notes. They did not represent additional obligations of that bank, but were given for money furnished by the Republic Bank, and the other banks of Austin, to discharge existing obligations of the Texas Bank. They therefore constituted valid obligations of said bank for which it received full consideration. Such obligations have been frequently sustained by the courts. Fellows v. Shaw (Tex. Civ. App.) 66 S.W.(2d) 741; Wyman v. Wallace, 201 U. S. 232, 26 S. Ct. 495, 50 L. Ed. 738; Chase v. Hall (C. C. A.) 30 F.(2d) 195; Derscheid v. Andrew (C.C.A.) 34 F.(2d) 884; Collins v. Caldwell (C. C. A.) 29 F.(2d) 329; Richter v. Laredo Nat'l Bank (C. C. A.) 62 F.(2d) 289.

■■ The next contention made by appellants is that the provision that said notes should be paid only out of assessments to be made against the stockholders rendered both the contract and the notes void. We have concluded that this provision is invalid, but that its invalidity does not, however, render either the assignment to the Republic Bank void, or the notes void. A stockholder's liability for the debts of the bank is not an asset of the bank itself which can by it be disposed of as it sees fit. It is a liability fixed by the Constitution (article 16, § 16) and the statutes for the benefit of the depositors and creditors of such bank, to be enforced by the banking commissioner as provided by law, when and to the extent he may find it necessary. It inures, in the hands of the banking commissioner, to the benefit of all the bank's creditors. Though creditors of such bank, where such emergency exists in the bank's affairs, may contract in good faith with the bank in contemplation of assessment against its stockholders, if that be found by the commissioner to be necessary, neither the bank itself nor such creditors can control in advance the funds to be derived from the levy of such assessment by the banking commissioner.

But neither the Texas Bank nor its stockholders can assert that said notes are not valid obligations against said bank, on the ground that an improper and unauthorized source of payment was attempted to be provided. $50,000 of the money for which said notes were given was furnished by Austin banks other than the Republic, to discharge the obligations owing by the Texas Bank, and $75,000 furnished by the Republic Bank. The Texas Bank therefore received the full benefit thereof, and these creditors were clearly entitled to reimbursement out of the assets of said bank.

■ In addition to the charges of fraud, appellants assert that said assessments were invalid because the banking commissioner had never in fact closed, nor taken over the assets of, Texas Bank as provided by law; nor had he made such assessments in accordance with law. Having determined the issue of fraud against the appellants, these contentions become unimportant. The character of notices placed upon the doors of the Texas Bank on June 27th was, we think, of no serious consequence. Likewise the action of its board of directors on June 30th in declaring that bank insolvent is unimportant. The bank had closed its doors and ceased to do business as a going concern on June 27th. The transaction whereby the Republic Bank took it over was in itself an act of insolvency, regardless of the subsequent resolution of its board of directors, or whether they had passed any resolution at all. And, after the transfer of all of its assets to the Republic Bank, no physical properties remained for the banking commissioner to take into his possession. Even if there had been, his failure to do so would not in itself be any defense to a suit to enforce a liability against the stockholders which had validly attached. Fellows v. Shaw, supra, and cases therein cited.

■■ And it has been repeatedly held in both federal and state courts that when the comptroller or the banking commissioner, absent fraud or bad faith, neither of which was shown in the instant case, determines that an assessment against the stockholders is necessary to pay the obligations of such bank, his determination of that matter is conclusive and cannot be attacked by the stockholders. This has been the uniform rule since Kennedy v. Gibson, 8 Wall. 498, 19 L. Ed. 476. See, also, Houston Nat'l Exchange Bank v. Chapman (Tex. Civ. App.) 263 S. W. 929, 933; State Banking Board v. Winter State Bank (Tex. Civ. App.) 13 S.W.(2d) 391, 393 (writ ref.); Austin v. Duffer (Tev. Civ. App.) 279 S. W. 318. When the conditions become such that the assets of a bank are insufficient to discharge its obligations, the Constitution fixes the stockholders' liability, and the statutes impose upon the commissioner the duty to enforce it. Even though he does not follow the exact provisions of the statute in the steps taken by him to enforce that liability,

his failure to do so is not available to the stockholders to defeat their liability. Houston Nat'l Bank v. Chapman, supra.

While payment of said notes cannot, we conclude. be enforced exclusively out of the assessments against the stockholders levied and to be collected by the banking commissioner, this inhibition does not invalidate either the notes as obligations against said bank nor the assessments made by him for the benefit of all creditors of said bank. Consequently, we think, the trial court rendered a proper judgment in any event, and it will therefore be affirmed.

Affirmed.

McCLENDON, C. J., not sitting.